## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KRISHNASWAMY SAMPATH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    CIVIL ACTION NO. 3:03-cv-264 |
| | ) |
| CONCURRENT TECHNOLOGIES | ) |
| CORPORATION, | ) |
| | )    JUDGE GIBSON |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

### SYNOPSIS

The above-captioned matter is before the Court on cross motions for summary judgment on a single count of retaliatory termination, in violation of 42 U.S.C. § 2000e-3(a). Plaintiff had, however, filed a previous lawsuit against the same Defendant at 3:02-cv-162 alleging various acts of discrimination as well as retaliation for earlier protected acts. Indeed, Plaintiff's filing of the first lawsuit was the protected act which allegedly engendered his termination and hence the present action.

Plaintiff moved to administratively discontinue the first lawsuit after filing a complaint regarding his termination with the Equal Employment Opportunity Commission on May 19, 2003, stating that the resulting investigation could be the basis for filing an amended complaint. Document No. 11 at 3:02-cv-162. While Plaintiff ultimately filed a completely new lawsuit rather than an amended complaint, he did invite the Court to reactivate the first complaint *sua sponte* in the context of the instant action. Document No. 66 p. 3.[1] Moreover, after reviewing the record, the Court found

---

[1] Document numbers not followed by a case number refer to 3:03-cv-264.

1

that although Plaintiff's claim for retaliatory termination could conceivably be addressed in isolation, neither of the parties had done so. To the contrary, they had developed a full record spanning the entire term of Plaintiff's employment with Defendant and addressing in detail Plaintiff's numerous claims of ongoing discrimination and retaliation.

The Court also determined that on the record no reasonable trier of fact could find for Plaintiff on any of his claims and that they were therefore ripe for summary judgment. A district court may enter summary judgment *sua sponte* so long as the party against whom it is to be entered has notice and an opportunity to oppose. *DL Res., Inc. v. FirstEnergy Solutions Corp.*, 506 F.3d 209, 223 (3d Cir. 2007) (citations omitted). Since the parties had developed a full record; Plaintiff had already indicated that he did not oppose a full adjudication of his claims; the record warranted entry of summary judgment against Plaintiff on all counts; and Defendant, as beneficiary, would not be prejudiced by this action, the Court proceeded to notify Plaintiff of its intent to enter summary judgment against Plaintiff on all claims. *See* Document No. 77. After considering Plaintiff's response, *see* Document No. 78, the Court enters summary judgment against Plaintiff on all counts.

## BACKGROUND

### Basis for the record

The Court's determination of the facts for purposes of summary judgment has been greatly complicated by Plaintiff's *pro se* representation. The Court advised the parties on January 3, 2007 that while "mindful of Plaintiff's *pro se* status" it would "ignore all unsubstantiated allegations, argumentative legal conclusions, and immaterial or disputed factual averments." Document No. 76. Plaintiff had nonetheless filed no affidavits until March 24, 2008; has never filed depositions; and has attempted to lay a foundation for only the few documents he has offered in Document No. 78-3. *See*

2

Document No. 65; Document No. 65-3; Document No. 67; Document No. 68. Defendant has, however, included in the record a transcript of a lengthy deposition of Plaintiff, in which he repeated under oath many of the unsworn allegations contained in his various filings.

To the extent that Defendant has admitted facts alleged by Plaintiff or has not objected to the admissibility of documents offered by Plaintiff, the Court has considered them. *See Advo, Inc. v. Phila. Newspapers, Inc.*, 51 F.3d 1191, 1201 n.9 (3d Cir. 1995); 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Rules of Civil Procedure § 2722 at 385-85 & nn.43-44 (3d ed. 1998) [hereinafter Wright & Miller](stating that "uncertified or otherwise inadmissible documents may be considered by the court if not challenged"). Since Plaintiff has made no valid objections to the admissibility of Defendant's evidence, the Court has at least considered it all.

Plaintiff does argue in his March 24, 2008 filing that Defendant's submissions must be "tethered to verifiable facts from contemporaneous *regularly kept* business records such as timesheets, payroll, test reports, project status reports, project financial records, client feedback survey, etc.," and complains that during discovery Defendant refused to produce such documents pursuant to his request. Document No. 78 pp. 4-5. He then asks the Court "to strike the entire present record proffered by Defendant as deceptive, unreliable and untrustworthy." *Id.* at 6. He also argues that Defendant's "untethered opinions" in the record should be excluded pursuant to Fed. R. Evid. 403, as they are "substantively more *prejudicial* to Plaintiff than probative." Document No. 78 p. 4 (emphasis in original).

Plaintiff has, initially, confused the business records exception to the hearsay rule, Fed. R. Evid. 803(6), with a general admissibility requirement. He also fails to realize that all relevant evidence is prejudicial, and Fed. R. Evid. 403 seeks to prevent only *unfair* prejudice. Regarding production of the enumerated business records, although Plaintiff refers to Defendant's response to his request, he has

3

not included evidence of such broad requests in the record. In addition, to the extent that he did ask for such information and did not receive it, he could have moved during discovery for an order to compel production pursuant to Fed. R. Civ. P. 37. That he failed to do so then does not provide a basis for objection now. Plaintiff was content to rest on the record for purposes of his initial motion for summary judgment and, indeed, while he has disputed the conclusions of the documents in the record, he has never disputed their authenticity.

Defendant has, even while admitting facts alleged by Plaintiff, made numerous objections to their materiality. *See* Document No. 71 ¶¶ 7-12, 18, 27, 29, 32-33. The Court has, however, *sua sponte* expanded the scope of this summary judgment to address all of Plaintiff's complaints of discrimination. Whatever the merits of Defendant's objections in the single-count retaliation action, Document No. 1, the Court finds that the facts alleged in Document No. 65 ¶¶ 7, 9-10, 12, 18, 29 and 32 are material for purposes of the broader inquiry, and Defendant's objections are therefore overruled.

**History**

Krishnaswamy Sampath (hereinafter Plaintiff) is "of Indian descent" and resides in Johnstown, Pennsylvania. Document No. 1¶ 5; Document No. 55 ¶ 13. He was awarded a Ph.D. from Ohio State University in 1989.[2] Defendant Concurrent Technologies Corporation (hereinafter CTC or Defendant) "is an independent, nonprofit, applied research and development" organization that serves "primarily federal and state governments and agencies" and is located in Johnstown, Pennsylvania. Document No.

---

[2] Plaintiff states that the degree was in (Welding) Engineering, Document No. 65 ¶ 1; Document No. 78-4 p.1; Defendant claims its records state that the degree "was in Metallurgy." Document No. 71 ¶ 1. Plaintiff, without offering any supporting evidence, claims that Defendant had previously provided affidavits to the Immigration and Naturalization Service stating that his degree was in fact in Welding Engineering. Document No. 78, p. 17. In light of that claim, he has moved for sanctions pursuant to Fed. R. Civ. P. 56(g), apparently alleging bad faith on the part of Defendant. Document No. 78 p. 18. The Court finds that since alleging a degree in metallurgy does not meaningfully undermine Plaintiff's claimed qualifications, the issue is immaterial and, in any event, Plaintiff has offered no proof of Defendant's earlier affidavits. On the evidence, no finding of bad faith is possible and no sanctions against Defendant are warranted.

4

16 ¶ 6; Document No. 55 ¶ 1; Document No. 67 ¶ 1

Plaintiff began his employment with Defendant on October 2, 1991 as "technical staff." Depo. p. 18; Ex. 2. His salary was $49,000 per year. Depo. p. 20. Plaintiff was promoted to "senior technical staff" in approximately six months, and to "principal technical staff" in approximately November of 1993. Depo. pp. 18-19. He received no further promotions during his tenure with CTC. Depo. p. 19; Ex. 5; Ex. 68 p. 4.

By the summer of 1994 Plaintiff had participated in the development of a new welding material and CTC was considering whether to seek a patent. Depo. pp. 71-72; Depo. Ex. 24 p. 2. In May of 1995, after nine months with no decision, Plaintiff "initiated a one-on-one meeting with J.B.Pursley, Jr., CTC's Executive Vice President," to address the issue. Document No. 55 ¶ 15; Document No. 67 ¶ 15. CTC decided to seek the patent shortly thereafter.[3] Depo. pp. 71-72; Depo. Ex. 24 p.2.

On October 27, 1995, Plaintiff received an annual performance evaluation prepared by Mary Jane Kleinosky, his line manager. Depo. Ex. 6. It characterized Plaintiff as the "[l]eading welding metallurgist at *CTC*"; said that he was "[h]ighly self-motivated . . . and [c]onsistently reached beyond his existing knowledge"; and that he had achieved substantial technical accomplishments in the previous twelve months. *Id.* at 2-3. However, the evaluation also strongly criticized Plaintiff's professionalism, including charges of insubordination for "boycott[ing] department meetings until his deliverables[4] were reviewed"; team work, including charges of "negativism and patronization" toward coworkers; communication skills, accusing him of "consistently going around" Ms. Kleinosky; and

---

[3] The patent was granted on April 28, 1998. Document No. 65-3 p. 16.

[4] Evidently the project documents he was charged with preparing.

5

attitude, urging him to "accept the fact that many colleagues are peers, not subordinates . . . ." *Id.* at

4. The evaluation found that Plaintiff had regressed since his last review and stated, in its assessment

of his potential for the following twelve months, merely that he could "remain in [his] present position,

providing corrective actions are taken to address issues" raised in the evaluation. *Id.* at 5.

Plaintiff disagreed with Ms. Kleinosky's appraisal, and sent her a seven-page single-spaced

memorandum in rebuttal. Depo. pp. 30-31; Ex. 7. Near the end of his memo, in reference to her

criticisms of his attitude, Plaintiff wrote:

> You had accused me that I question your authority to appraise my performance. I do
> not question your job function as a Line Manager in appraising my performance. I
> recognize that someone who is fair, honest, impartial and objective has to appraise the
> performance of an employee; it is an organizational need and I recognize that it is also
> a difficult job. However, from what I perceive of your attitude and professionalism, I
> have strong concerns about your ability to be fair, truthful, impartial and objective. This
> is a genuine concern and I have previously requested the Process Technology Director
> to address it suitably. In the light of the above clarifications and rebuttal, it is my well
> considered opinion that your current performance appraisal is unfair, untrue, partial and
> lacks objectivity. It is unfortunate but true.

Ex. 7 p. 6. At the end of the memo Plaintiff requested a reappraisal; none was performed. Depo. p. 33;

Ex. 7 p.7.

Shortly thereafter, Plaintiff was transferred to a different department and Don Walukas became

his new line manager. Depo. p. 37; Document No. 55 ¶ 25; Document No. 67 ¶ 25. In a performance

review dated October 31, 1996, Walukas stated that Plaintiff had "made improvements in his

interpersonal skills [but needed to] develop further for full use of his excellent technical skills within

CTC," and rated him two on a scale of one to five, where two meant that "[j]ob performance meets

minimum requirements of the position, but not on a consistent basis."[5] Depo. pp. 36-37; Ex. 9. This

---

[5] There was apparently a change in format from the previous year's assessment form, which did not use numerical ratings. *Compare* Ex. 6 p. 4.

6

evaluation was lower than Ms. Kleinosky's evaluation of him during the previous year. Depo. p. 38.

Walukas also performed Plaintiff's 1997 evaluation, which Plaintiff received on October 30, 1997. Depo. p. 39; Ex. 10. He found "improvement," rating Plaintiff a three, meaning "[j]ob performance [was] consistent within position requirements," and found his long-term potential to be "very positive." Depo. Ex. 10 p. 4. The evaluation did, however, admonish Plaintiff to "'get over' [his] NCEMT[6] experience & continue to keep a positive attitude." *Id.* at 3; Depo. pp. 39-40. During his deposition, Plaintiff admitted that he had been "taken off" the NCEMT program, and said that "[n]obody gave [him] work." Depo. p. 40. He nonetheless claimed to have gotten along with everyone that he knew on the program. *Id.* at 41-42.

Also on October 30, 1997, Defendant's Chief Environmental Scientist, Robert Elves, nominated Plaintiff for "Patent Agent Training and Registration." Document No. 65 ¶ 10; Document No. 65-3 p. 13; Document No. 71 ¶ 10. Elves said that he had "been very impressed with [Plaintiff's] capabilities on the Advanced Consumables Patent Application" and "recommend[ed] him without reservation." *Id.*

On May 1, 1998, Plaintiff requested a leave of absence from CTC to pursue an MBA in a twelve-month program at Cornell University that was set to begin on May 26, 2008. Depo. pp. 42-43; Ex. 11. Plaintiff asked for paid leave, at least to the extent that he would be compensated for any work assigned him during his year at Cornell; paid benefits; and tuition reimbursement. Depo. pp. 42-43; Depo. Ex. 11. Defendant granted him unpaid leave; gave him the option of purchasing medical, dental, prescription drug and vision insurance through COBRA; and refused to reimburse his tuition. Depo.

---

[6] National Center for Excellence in Metalworking Technology, operated by CTC in Johnstown. Ex. 24 p. 18. This was evidently the department in which Plaintiff worked under Ms. Kleinosky's supervision.

pp. 43-45; Depo Ex. 12; Jones Aff. Plaintiff was also advised that "every effort [would] be made to return [him] to [his] former position of employment at the end of the leave, if such a position [was] available." Ex. 12; Jones Aff.

Plaintiff returned to CTC some time between the last week of May and July of 1999. Depo. p. 45. He received a memorandum dated June 2, 1999 from F. R. Dax, the manager of the department in which Plaintiff would be working, that discussed his return, evidently to the NCEMT program. Document No. 65-3 p. 19;[7] Depo. p. 51. The memo stated that Defendant did not "have an opportunity that would utilize [Plaintiff's] new MBA degree," and claimed that Plaintiff had agreed that the technical assignments then available "would be fine . . . until other opportunities were available." *Id.* Its last paragraph read as follows:

Since you were coming into the Process Technologies Directorate, Jerry [Hudson] and I reviewed your personnel file and identified some previous performance issues that resulted in your transfer into Don Walukas' department. Your last performance appraisal given by Don indicates that these issues have been corrected. However, Jerry is concerned that you are returning to the group and an environment where those performance issues existed. I also have that concern. You have assured Jerry that the past is the past and that from your perspective, there will not be a repeat of those issues. Jerry and I accept that those issues are in the past, but it is important that you understand that we cannot have a repeat of those issues. If they surface again, there will be immediate disciplinary action taken.

*Id.*

Plaintiff requested vacation leave in July of 1999. Depo. pp. 45-46; Ex. 13. It was granted and he went to India for "[a]bout two or three weeks" in August of 1999. Depo. pp. 45-46. A memorandum prepared by Jerry Hudson dated July 16, 1999 expressed disappointment in Plaintiff for seeking leave

---

[7] This document is part of Plaintiff's Appendix of Record Evidence filed in conjunction with his consolidated motion for summary judgment, Document No. 63. Plaintiff has laid no foundation for the admissibility of this document. However, not only has Defendant not challenged the document's admissibility, it has stated that the document "is a writing that speaks for itself and accurately expresses the Defendant's employment needs at that time." Document No. 71 ¶ 18. The Court will therefore include the document in the record to be considered for purposes of summary judgment.

8

so soon after returning, since management had spent time "getting assignments" for Plaintiff and "getting [him] up to speed," and said that Plaintiff was not meeting Hudson's performance expectations. Depo. pp. 45-46; Ex. 13.

The parties dispute whether Plaintiff received an annual evaluation in 1999. Document No.55 ¶ 32; Document No. 67 ¶ 32. They agree, however, that in preparing Plaintiff's 2000 evaluation Plaintiff's line manager, Greg Holt, "sought feedback from CTC employees that worked with Plaintiff, including Gerard Mercier and Richard Henry," as well as Plaintiff" himself. Document No. 55 ¶ 33; Document No. 67 ¶ 33. Plaintiff rated himself "at the highest level on everything except for ability to communicate verbally, where [he gave himself] a level 3" of 5, using the same scale discussed above. Depo. p. 52; Document No. 55 ¶34; Document No. 67 ¶ 34. There is no formal evaluation from Mercier in the record, although he did describe a "major blow up" in the latter part of 2000 where, in an end of project meeting with a metal alloy supplier and its client Plaintiff said the supplier had altered its alloy's composition to save money, thereby compromising quality.[8] Document No. 55 ¶¶ 38-39; Document No. 67 ¶¶ 38-39; Depo pp. 46-47; Ex. 14. Plaintiff states that the incident was "not exactly like what Mr. Mercier portray[ed] it to be," and has supplied a contract feedback survey and accompanying affidavit indicating that the supplier's client found that Plaintiff's team had met or exceeded its expectations. Depo. pp. 46-47; Document No. 78-3 pp. 2-3, 7-8.

Richard Henry did provide an evaluation. Depo. pp. 48-52; Depo. Ex. 15. Henry was the program manager of the NCEMT program, "one of, if not the most significant program[s] at CTC."

---

[8] Plaintiff, while admitting that Mr. Mercier did not approve of his conduct, has attempted to offer evidence that he claims shows he acted in a praiseworthy fashion in this affair. *See* Document No. 67 ¶ 38 (citing Document No. 65-3 p. 23; Document No. 68 pp. 7-8).; *see also* Document No. 78-3 pp. 7-8 (same as Document No. 68 pp. 7-8). However, only Document No. 78-3 is attached to an affidavit. Plaintiff has otherwise offered only unsworn assertions as to the documents' provenance and significance. Moreover, Defendant has objected to their admissibility. Document No. 73 p. 1 & ¶ 38. The Court will therefore consider only Document No. 78-3 pp. 7-8 for purposes of the instant action.

9

Depo. p. 51. In § VI of the assessment form there are various categories employing the same numerical

rating system discussed above. Mr. Henry found Plaintiff to perform consistently with position

requirements in two of seven categories; his other ratings were lower. Ex. 15 § VI. He also wrote as

follows:

> Strong technical opinions, adequate on schedule/quality aspects of project work, focused on pleasing present client, has difficulty getting along with internal clients, makes independent, often provocative decisions."

*Id.* § III.

> Plaintiff has a self serving aire [sic] that limits his ability to lead others, he is often in conflict with others on technical issues and does not appear to seek common understanding, he does not appear to be able to estimate costs well, he appears to be placing clients [sic] interests ahead of CTC/NCEMT, it is difficult to reach a common understanding with him of what requirements he is to fulfill and what limitations are on his actions, and when you think you have an understanding he often does something unexpected.

*Id.* § IV.

> I was not satisfied with [Plaintiff's] performance as [program manager] and do no plan to use him as a [program manager] again.

*Id.* at § V.

> [Plaintiff] has CREDENTIALS but it is not apparent that his understanding is consistent with his credentials. . . . He has not shown the ability to estimate or control costs well. I would think that an MBA from Cornell could estimate costs and would have sufficient business understanding to control them. I have seen no improvement in [Plaintiff's] ability to understand the NCEMT program and to follow directions. . . . [Plaintiff] presents a positive aire [sic] and appears friendly. However, he is often in conflict with others, appears to believe he and only he knows what is best to do, and ends up putting down other people and CTC. When you appear to be locked into a world view of your own superiority, you cannot readily respond to other people's ideas and actions. This limits your agility.

*Id.* at § VI.

10

Plaintiff's performance evaluation for 2000,[9] received by Plaintiff on October 26, 2000, rated Plaintiff a 3 and said that "[o]verall, [Plaintiff] is very intelligent, hard working and generally pleasing to work with. I believe that past misunderstandings have marred his reputation. If specific direction is agreed to by all parties involved and adhered to, [Plaintiff] can be one of the best resources CTC has." Ex. 17 p. 4. The evaluation also listed 12-month goals including conducting "in-depth manufacturing cost analysis in support of both NCEMT and commercial projects" and three to five year goals of becoming "a member of CTC's Leadership Team." *Id.* Plaintiff found the review to be "not fair" due to its failure to "recognize work that [he had] contributed for excellence of the CTC program," Depo. p. 54, and responded as follows:

Time and again, I have demonstrated my commitment to CTC despite heavy fall-outs from past misunderstandings. Now it is CTC's turn to move beyond past misunderstandings and adequately recognize my performance and contributions for achieving Excellance [sic] at CTC.

Ex. 17 p. 4

Approximately one month later, Plaintiff spoke with Jay Bleehash, Defendant's Manager of Human Resources, while they were both exiting the CTC building. Depo. pp. 55-56; Depo. Ex. 18; Bleehash Aff. Plaintiff inquired about "his compensation relative to his peers at the Principal Staff level (150)." Depo. pp. 55-56; Ex. 18 Bleehash Aff. Bleehash informed Plaintiff that "his [previously-conducted] analysis did not show any significant inequities." Ex. 18; Bleehash Aff. Plaintiff told Bleehash that CTC was "victimizing him" in that Plaintiff had "unmatched technical abilities that were not being recognized either in the form of a promotion or salary adjustments beyond the normal merit raises." Ex. 18; Depo. p.56; Bleeshash Aff. Bleehash explained that "there [were] several things that

<hr>

[9] There is a dispute as to the authorship of the final evaluation, but none as to its contents. Document No. 65 ¶ 22; Document No. 71 ¶ 22; Depo. pp. 53-54.

CTC look[ed] for at every position level," and advised Plaintiff to "work with his manager to assess whether his manager [had] the same perception of his technical prowess and nail down what other areas in addition to his technical skills, that he might continue to develop to continue to progress in the organization." Depo. pp. 56-57; Ex. 18; Bleehash Aff.

Plaintiff also stated that CTC had not recognized his MBA "in the form of additional compensation, etc." Depo. Ex. 18; Bleehash Aff. Bleehash stated that he too was working on an MBA, and that once he received the degree he would look for a new job if he "felt that CTC could not provide the career opportunities that [he] was looking for." Depo. Ex. 18; Bleehash Aff. Plaintiff responded "that he was more interested in proving CTC management wrong and demonstrating that he should be recognized in compensation or position level for the [sic] getting the degree." Depo. Ex. 18; Bleehash Aff.

In response to Plaintiff's conversation with Bleehash, Kathy Jones, Defendant's Director of Human Resources, set up a meeting with her, Plaintiff, and Bleehash on January 4, 2001, to "air" some of Plaintiff's concerns. Depo. pp. 59-61; Ex. 19 p. 1; Ex. 32 p.1; Jones Aff.; Bleehash Aff. Plaintiff stated that he was not being paid fairly. Ex. 19 p.2; Jones Aff. He said that he had been denied tuition reimbursement "while others were approved." Ex. 19 p.2; Depo. p. 60; Jones Aff. Plaintiff said that Perez Khan, Barry Lerner and Anand Paul had been given tuition assistance; that Paul's tuition had been paid although Paul had taken a leave of absence; and that K.G. Anand had gone to Cornell. Ex. 19 p.2; Depo. p. 60 (admitting that in fact he "d[id] not know for sure" whether Khan, Learner and Paul received tuition assistance); Jones Aff. He discussed the performance review by Kleinosky, his rebuttal, and his request for a reappraisal. Ex. 19 p.2; Depo. pp. 60-61; Jones Aff. He said that the memo he had received from Dax upon his return from Cornell, Document No. 65-3 p.19, was "unfair,"

12

and was informed that it had been written at Jones's direction. Ex. 19 p. 2; Jones Aff.

Plaintiff "then pulled out the recently released EEO policy,"[10] and said that "he [had] been discriminated on." Ex. 19 p. 3; Jones Aff. He offered three examples: (1) Dick Henry had not asked him to accept an award for a poster that Plaintiff had "developed"; (2) Dick Henry had not asked him to make a presentation at the Metal Technology Review; and (3) he was not allowed to represent the NCEMT at a shipbuilding symposium. Ex. 19 p.3; Jones Aff.

Jones asked Plaintiff what he "wanted to happen." Ex. 19 p.3; Jones Aff. Plaintiff responded that he "wanted to be on the Leadership [T]eam." Ex. 19 p.3; Jones Aff. Jones told Plaintiff that she "would need to look into some of [those] issues and get back to him." Ex. 19 p.3; Jones Aff.

After that meeting, Jones met with Plaintiff's line management, "discussed promotion possibilities, reviewed the tuition reimbursement program," and reviewed Plaintiff's compensation. Ex. 32 p.1; Jones Aff. There was a followup meeting on March 20, 2001, with Plaintiff, George Blasiole, Jones, and Bleehash. Depo. p. 61; Ex. 20; Jones Aff.; Bleehash Aff. Jones explained to Plaintiff that although K.G. Anand had "received approval for an extension of the tuition reimbursement program,[11] no money was ever paid to Mr. Anand." Ex. 32 p. 1; Jones Aff. Jones also told Plaintiff that she "did not see anything unfair" in his previous performance reviews and that she could not change them in any event. Ex.20 pp.1-2; Ex. 32 p.1; Jones Aff. She further told Plaintiff that,

---

[10] The policy read in pertinent part: "It has been and will continue to be the position of [CTC] to be an equal employment opportunity employer. In keeping with this policy, CTC will continue to recruit, hire, train and promote to all job levels the most qualified persons without regard to race, color, religion, sex or national origin, age, handicap, veteran's status and other protected classes under state laws. CTC will similarly continue to administer all other personnel matters (such as compensation, benefits, transfers, layoffs, company sponsored training, education, tuition assistance and social and recreational programs) in accordance with this equal opportunity policy." Document No. 65 ¶ 19; Document No. 71 ¶ 19.

[11] The policy stated that, "[o]nly those employees in an active, full-time status . . . [were] eligible for tuition reimbursement." Document No. 71-3 p.3; Document No. 71-2 ¶ 4.

13

"based on [his] performance rating," his merit raises had always been close to the maximum amount to which he was entitled. Ex. 20 p.1; Ex. 32 p. 1; Jones Aff. Plaintiff nonetheless expressed dissatisfaction with his salary, stating that it had been "negatively impacted" by prior evaluations. Ex. 20 p. 1; Jones Aff.; Bleehash Aff.

Plaintiff then read a prepared statement. Depo. pp. 63-64; Ex. 20; Ex. 21; Jones Aff.; Bleehash Aff. In the statement, Plaintiff said that since his "meeting with J.B. Pursley, Jr. in May 1995 [he had] been unfairly targeted and victimized by a group of *CTC* employees who abused their position, responsibility, authority and accountability with a sole aim to teach [him] a lesson for 'breaking the chain of command.'" Depo. pp. 63-64; Ex. 21 p.1. He said that he had "basically [been] denied . . . equal employment opportunity" when he was not permitted to go to Los Angeles in 1997 to accept an award of first prize for a poster he had presented the previous year, and when his program manager was allowed to present Plaintiff's work at a professional conference. Depo. pp. 63-64; Ex. 21 p. 1. He claimed that "this type of behavior" showed a "*clear pattern* that [had] been orchestrated to deny [him] equal employment opportunity and opportunities for career growth," and stated that he had brought these matters to the attention of Blasiole "[i]n recent times." Depo. pp. 63-64; Ex. 21 p.1 (emphasis in original).

The statement went on to allege that "[o]ver the years, *CTC* [had] used various means to discriminate against [Plaintiff], and had administered several personnel matters (such as compensation, benefits, company sponsored training, education, tuition assistance) *not* in accordance with the equal employment opportunity policy. Depo. pp. 63-64; Ex. 21 p. 1 (emphasis in original). As an example of such discrimination, Plaintiff said that CTC had offered tuition assistance to K.G. Anand in 1996 for his Cornell MBA, but had denied the same assistance to Plaintiff two years later. Depo. pp. 63-64;

14

Ex. 21 pp. 1-2; Ex. 39 p. 11. Anand was also "of Indian origin." Depo. p. 103; Ex. 39 pp. 11-12.

The statement closed with the following list of questions:

> [H]ow would CTC correct and compensate me for the injustice that it has meted out to me over the years despite my technical leadership and project performance? How would CTC reward me for my commitment, resolve and determination to stand up and display my professionalism despite such unfair and sustained targeting? Would CTC start an internal investigation and based on the results suitably punish those who violated CTC policies and procedures?

Depo. pp. 63-64; Ex. p. 2.

When Plaintiff was asked what he wanted, he said that he wanted Defendant to change performance reviews that had been done five to six years previously and to "fix" his ratings and salary. Depo. pp. 62-64, Ex. 20 p.1 ; Jones Aff.; Bleehash Aff. He was advised that Defendant could not and would not do that. Depo. pp. 62-64, Ex. 20 p.2 ; Jones Aff.; Bleehash Aff. Jones then asked whether, if she went "today" to get a raise authorized for Plaintiff to the "mid point of the [salary] range, which represent[ed] the going market rate for his position level" he would feel more fairly compensated. Depo. p. 63; Ex. 20 p. 2; Ex. 32 p. 2; Jones Aff.; Bleehash Aff. Plaintiff answered "no," that he belonged in the top third of his salary category.[12] Document No. 55 ¶ 55; Document No. 67 ¶ 55; Depo. p. 63; Ex. 20 p. 2; Ex. 32 p. 2; Jones Aff.; Bleehash Aff. The meeting closed with Blasiole's promise to provide Plaintiff with "examples of what it [took] to be at the [next promotion] level." Ex. 20. p. 2; Ex. 32 p.2; Jones Aff.; Bleehash Aff.

In June of 2001, Plaintiff's Line Director contacted Jones regarding Plaintiff. Ex. 32 p. 2; Jones Aff. Jones and the Line Director met with Plaintiff and suggested that he participate in Defendant's Employee Assistance Program (hereinafter EAP) to help him deal with his apparent unhappiness with

---

[12] Plaintiff was then being paid $79,500 per year; the minimum salary for his position was $71,000 per year; the mid point salary that he was offered was $89,000 per year; the top third range started at $95,000 per year; and the maximum salary for his position was $107,000 per year. Ex. 35; Jones Aff.

his job. Ex. 32 p. 2; Jones Aff. Plaintiff responded that he had been unfairly treated and "wanted another investigation elevated to members of the Executive Management Team." Ex. 32 p. 2; Jones Aff. Jones then requested that Plaintiff "put all [his] grievances in writing." Depo. pp. 71-72; Ex. 32; Jones Aff.

Plaintiff responded on July 5, 2001, with a nine-page single-spaced memorandum. Depo. pp. 71-72; Ex. 24. It contained his "significant grievances," but "not all" of his complaints. Depo. p. 72; Ex. 24. His description of specific instances of discrimination began as follows:

> Subsequent to my one-on-one meeting with J.B. Pursley, Jr., in May 1995, as a *quid pro quo*, I have been unfairly targeted and victimized by a group of *CTC* employees. In unfairly retaliating, these employees abused their position and $RA^2$ [responsibility, authority and accountability] with a sole aim to teach me a lesson for "breaking the chain of command." They used false charges and tried to remove me from my employment with *CTC* and also ruin my professional reputation at *CTC*. I was mis-characterized as someone very difficult to work with, that I insisted the projects and tasks must be done either my way or the highway, that I talked down to others, I lacked professionalism, objectivity, perspective, showed insubordination, etc. It must be recognized that none of these "characteristics" raised their ugly heads in my performance appraisals beginning May 1992 and ending November 1994. One should wonder what had changed since the 1994 performance appraisal that positioned this select group of employees to unfairly target me with false charges, and try their best to ruin my professional reputation.

Depo. p. 72; Ex. 24 pp. 3-4; Ex. 39 p. 16.

Plaintiff stated that a "group of employees" allied against him "used one pretext or other to deny [him] equal employment opportunities to present or publish [his] project results" and since 1995 had "administered several personnel matters (such as compensation, benefits, cost of living adjustment, company-sponsored training, education, tuition assistance) in violation of the equal employment opportunity act." Depo. pp. 71-73; Ex. 24 pp.4, 6. He complained about a memo sent to him by R. J. Henry on June 27, 1996, which stated Defendant's position that "[u]nauthorized contacts" between NCEMT staffers and parties outside CTC were "at best, ill-advised and unwarranted" and reiterated

16

previous instructions that Plaintiff was "to have no contact with outside personnel without prior

approval." Depo. pp. 71-73; Ex. 24 p. 32. In discussing that missive, Plaintiff wrote:

> This memo was full of false charges that alleged me of potentially bringing disrepute to *CTC*
> and conniving with, or aiding and abetting *CTC* detractors. While all of these allegations were
> farther from the truth, this memo also served as an *in cognito* direction to other Line managers
> and PMts serving the NCEMT contract on how to ill-treat me and deny me equal employment
> opportunities despite my demonstrated KSA [knowledge, skills and abilities] in support of
> various NCEMT projects.

Depo. pp. 71-73; Ex. 24 p. 5.

Plaintiff also complained that others within CTC "misappropriated" what he termed "equal

employment opportunit[ies]" that should have been his to present various posters and project results.

Depo. pp. 71-73; Ex. 24 p. 5. Plaintiff wrote that he:

> brought all of these instances [of misappropriation] to the attention of G. A. Blasiole as
> soon as they occurred. He had the requisite $RA^2$ and opportunities to stop, reverse and
> correct these occurrences but regrettably he failed to even take cognizance of these
> violations. Neither did he show a willingness to undertake any thoughtful planning
> necessary to ensure that *CTC* remained committed to nondiscrimination at workplace,
> nor did he volunteer to exercise affirmative steps to insure its proper implementation.

Depo. pp. 71-73; Ex. 24 p. 5; Depo. pp. 71-73. Plaintiff further alleged that the "occurrences" he had

discussed "show[ed] a clear *pattern* that [had] been orchestrated over the years to deny [him] equal

employment opportunity and opportunities for career growth at *CTC*." Ex. 24 pp. 5-6, 9 (emphasis in

original); Depo. pp. 71-73. He reiterated that Defendant had not paid for his MBA and went on to state

that his "overall and unique contributions [from the use of his MBA] were simply not recognized in any

way, shape or form despite an assurance from J. R. Hudson that he would use the EIP [not defined by

Plaintiff] to recognize self-financed education that had been put to use at *CTC*." Ex. 24 p. 6; Depo. pp.

71-73.

Plaintiff claimed that he had "the best record of accomplishments at *CTC*," citing a prize-

17

winning poster presentation; his work in obtaining a patent; and letters of praise from Howard Kuhn dated June 3, 1996 and a professor of mining and metallurgy dated November 1, 1996. Ex.24 p. 6, 35-36; Depo pp. 71-73. He said that such accomplishment entitled him to the CTC Employee of the Year Award; that he had not received it "or any other recognition till to date"; and that denial of the Employee of the Year Award was a specific instance of discrimination. Ex. 24 p. 6; Depo. p. 73; Document No. 55 ¶ 63; Document No. 67 ¶ 63. He also complained of a "disparaging e-mail" sent by Dr. Francis Mollard "to a select group of employees" upon the announcement of the patent award. Ex. 24 p. 7; Depo. p.73; *see also* Ex. 39 p. 4 (stating that the e-mail "clearly illustrat[ed] [Mollard's] prejudice and anger that despite the wide abuse of his position and authority *CTC* had succeeded in obtaining the . . . Patent").[13] Plaintiff also claimed that "the adverse *CTC* working conditions [had] affected [his] health while [his] family also underwent the pain and suffering making [them] wonder in the final analysis whether all this [was] worth one's effort to continue to work at *CTC* with honor and pride." Ex. 24 p. 6.

In summary, Plaintiff said that he was "appalled that such unfair and unethical behaviors continue[d] at *CTC* to the detriment of professional advancement and career growth of persons like [him], while those who perpetrate[d] such inhuman crimes [went] unchecked, unpunished and perhaps rewarded as well." Ex. p. 9; Depo. pp. 71-73. He requested that CTC (1) "not overtly or covertly undertake any retaliatory actions against [him]"; (2) "arrange for a timely, transparent, fair and objective investigation"; (3) "[p]rovide [him] with a hard copy of the nature of the investigation; how it was conducted, its final results and conclusions"; (4) "institute and implement appropriate [rules] that

---

[13] Mollard's e-mail read in its entirety, "Whoa! Please make sure I get invited to the celebration party! Francois." Ex. 24 p. 17; Depo. p. 73.

18

would clearly show zero tolerance on such issues and also not allow a repetition of these occurrences to anyone who chooses to pursue a career at *CTC*"; and (5) "restore [Plaintiff's] rightful place at *CTC*, and adequately compensate [him] for the lost opportunities, humiliation, pain and suffering, and other collateral damages." Ex. 24 p. 9; Depo. pp. 71-73. He also requested that a copy of his memorandum be kept in his employee file "so it could be made available to any Federal and/or State Government agencies seeking information on reported discriminatory practices and violations of Equal Employment Opportunities (EEO) Act." Ex. 24 p. 9; Depo. pp. 71-73.

At no place in Plaintiff's memorandum was there any mention of "national origin discrimination." Depo. p. 74; Ex. 24. At his deposition, Plaintiff said that he did not mention it at the time because he "was trying to be nice to CTC" and "did not want to show them the elephant in the living room." Depo. p. 74. Plaintiff filed a complaint with the United States Department of Labor on the same day as he delivered his memorandum to Ms. Jones.[14] Depo. pp. 74-75. He claimed that he did so to protect himself, saying that he "had to do what [he] had to do." Depo. p. 75.

Ms. Jones met with Plaintiff on July 10, 2001 to discuss his memorandum. Depo. pp. 75-76; Ex. 26; Jones Aff. At the meeting he recited a list of people whom he claimed had discriminated against him "because he went out of the chain of command" when he spoke with John Pursley on June 17, 1995 about the patent. Depo. pp. 75-76; Ex. 26; Jones Aff. Ms. Jones told plaintiff that she would investigate his complaints using a procedure similar to what she used for investigating allegations of sexual harassment, and would advise him of the results in a written report. Ex. 26. Depo. pp. 75-76; Jones Aff.

---

[14] The complaint is not in the record. Plaintiff received a letter from EEOC in response to this filing, Depo. p. 75; that letter is also not part of the record.

19

On September 7, 2001, Defendant asked Plaintiff to sign a form assigning patent rights to CTC. Depo. pp. 78-79; Ex. 28. Plaintiff has admitted that intellectual property developed by employees of CTC "was the property of CTC and inventors were [required] to assign such inventions to CTC." Depo. pp. 79-80; *see also* Ex. 27 (Plaintiff's signature indicating that he had "read and reviewed *CTC*'s Intellectual Property Manual"); Ex. 30 (citing the assignment policy from the manual as previously explained to Plaintiff). On September 7, 2001, however, Plaintiff wrote that "as far as [he] could understand, the *CTC*'s Intellectual Property procedures and manual did not address this aspect or provide adequate clarity," and that he could "not bring [him]self to continue to assign patent rights to *CTC pro bono* any more and without appropriate reward and recognition based on any one's just and fair expectations." Ex. 28; Depo. pp. 78-79. He also sought clarification of his duties pursuant to 37 C.F.R. § 1.56(a).[15] Ex. 28.

On September 17, 2001, Plaintiff e-mailed Jones, telling her that he had been advised that if he did not sign the patent assignment form he would be issued a notice of insubordination. Ex. 29; Depo. p. 80. Plaintiff also stated that if he signed the Declaration Form he would be committed to "a lot of over and beyond technical work that *CTC* [had] not support[ed] with a charge number or recognize[d] in the past," and that this had been part of his EEO complaint to Jones. Ex. 29; Depo. p. 80-81. He said that since his EEO complaint was still pending with Jones, "such actions on the part of *CTC* could further aggravate resolution of this matter," and asked that Jones "role" (sic) the current incident into his earlier complaint "as an additional *CTC* attempt to harass a valuable employee." Ex. 29; Depo. p. 80-81.

---

[15] They included careful examination of "(1) Prior art cited in search reports of a foreign patent office in a counterpart application, and (2) The closest information over which individuals associated with the filing or prosecution of a patent application believe any pending claim patentably defines, to make sure that any material information contained therein is disclosed to the [Patent] Office." 37 C.F.R. § 1.56(a).

On September 18, 2001, Plaintiff was issued a Notification of Insubordinate Behavior for refusing to abide by Defendant's intellectual property policy and insisting upon additional compensation before assigning his rights. Ex. 30; Depo. pp. 82-83. He taped it to the white board in his "cube." Depo. pp. 82-83. He responded in writing on September 19, 2001,[16] requesting that Defendant "withdraw the subject memo forthwith." Ex. 31 p. 2; Depo. pp. 83-85. He reviewed the support he had provided for the two previous patents with which he had been involved at CTC; noted information on Defendant's "IWeb" that he claimed stated that "IP [could] provide the employee with advancement opportunities and personal rewards"; bemoaned his own lack of reward from CTC; and stated that he therefore considered the posting to be "a deceptive practice." Ex. 31 pp. 2-3; Depo. p. 84. He then continued as follows:

Let use leave aside the questions of fairness and employee motivation for a while. I always wonder how such a Company policy is different from the policies and practices behind slavery? Justifiably, slavery was abolished in the US over hundred years ago. My understanding is that slavery is also currently illegal in any way, shape or form. I would not like *CTC* to perpetuate slavery in any way, shape or form, or transgress legal boundaries. In my view, this is a bad policy and practice rooted in slavery. . . . I would not like *CTC* to perceive that by virtue of my employment at *CTC*, I would willingly assign all my rights to *CTC*, as a slave would submit his inalienable rights to his master.

Ex. 31 p. 3; Depo. pp. 84-85. Plaintiff closed by asking Defendant to "resolve not to continue these witch-hunting practices that consider every clarion call as an act of insubordination," and expressing his belief that CTC, "in all its profound wisdom and objectivity, would not perceive or view [his] truly professional behavior in any other way except in the spirit of true leadership." Ex. 31 p. 4.

On September 21, 2001, Jones released her report on her investigation into Plaintiff's complaints. Defendant noted that Plaintiff had not "alleged any discrimination or illegal conduct by

---

[16] The e-mail to which the memo was attached is dated September 19. Ex. 31 p. 1. However, the memo itself is dated September 21, 2001. Ex. 31 p. 2. Regardless of the date, Plaintiff does not dispute the contents of his memo. *See* Depo. pp. 83-85.

21

*CTC* based upon any protected class to which [he] may be a member." Ex. 32 p. 3. Depo. pp. 86-87. Regarding Defendant's decision not to send Plaintiff to various conferences, Ms. Jones wrote that those decisions were made by the project managers, "based on a good business reason at the time of the conference." Ex. 32 p. 4. *CTC* had "the responsibility to present *CTC*'s work in the most positive way, considering cost and presentation skills," and managers needed "to send the person best suited to turn *CTC*'s technical developments into business for the company . . . ." *Id.* Plaintiff's "inability to take criticism and [his] overly argumentative nature" had not made him "an ideal candidate to send to conferences." *Id.*

Regarding tuition reimbursement, the report stated that K.G. Anand had received approval for tuition reimbursement "as a part-time employee while in pursuit of his MBA"; that he had left CTC shortly after completing his degree; that CTC did not in fact reimburse Anand; and that, to Jones's knowledge, Defendant had not subsequently granted similar requests. Ex. 32 p. 3; Depo. pp. 87-88. Plaintiff stated at his deposition that he had "no reason not to believe" that Anand had received no reimbursement. Depo. p. 87.

Ms. Jones had the following final comments:

> My overall assessment has led me to the conclusion that you have an over inflated view of your accomplishments which is evident by the tone and content of your memorandum. Your associated behavior has ostracized you from your co-workers and management. Additionally, it has off-set any of your accomplishments as opposed to your desired effect; recognition. . . . While it is critical for you to demonstrate individual technical achievements, you can not ostracize yourself from your co-workers in the process. . . . [M]y response and this memorandum bring this matter to a close. . . . The company expects that these [issues you have raised] will no longer be discussed and we will be moving forward. If you persist in raising these issues, such action will adversely affect your performance appraisals and may lead to disciplinary action.

Ex. 32 p. 4; Depo. p. 88. Plaintiff disagreed with "everything [Ms. Jones] did in that report" and said that "[s]he swept everything away under the rug." Depo. p. 77.

22

Plaintiff filed his first complaint directly with the EEOC on October 10, 2001. Ex. 2. In the complaint, he said that his program manager, Dick Henry, "ha[d] given assignments to others which should have been given to [Plaintiff]," thereby "hampering [his] development" and affecting his evaluations and hence his compensation. *Id.* at ¶ 1. He went on to state that he had complained to George Blasiole, "Executive Director," about Henry's actions "between 9/00 and 6/01," and that Blasiole had "failed to acknowledge the complaint." *Id.* at ¶ 2. He also alleged discrimination pursuant to "Title VII of the Civil Rights Act due to [his] race, Asian and [his] National Origin, Indian," where other people were asked to make presentations of what Plaintiff considered to be his work in September, 2000, November, 2000, and on July 25, 2001. *Id.* at ¶ 3.

Plaintiff received his next annual evaluation on October 30, 2001. It showed regression from the previous year and he was once again rated at level 2, where "[j]ob performance meets minimum requirements of the position, but not on a consistent basis." Ex. 36 p. 4; Depo p. 95. The evaluation said that "[t]oo often, [program managers] respond that they would not task [Plaintiff] in the future due to excessive time charges relative to usable results provided," and that his personality and interactions with others had "made it very diffucult [sic] for line management to find appropriate tasking at Principal Staff level for [Plaintiff]." Ex. 36 p. 3; Depo p. 95. The evaluation concluded that "[Plaintiff's] continuous negative attitude and inconsistant [sic] performance has made it very difficult for [Plaintiff] and [line manager] to find appropriate tasking," and that Plaintiff "[m]ust change performance and behavior if continued employment at CTC is expected." Ex. 36 p. 4.

Plaintiff responded that the review was "entirely unfair, biased and typically 'judgmental'"; that it was "deja vu 1995 EPA [Exempt Performance Analysis, the annual evaluation] all over again"; and that it demonstrated "unfair and unethical office practices and politics," as illustrated by a Dilbert comic

23

strip attached to Plaintiff's response. Ex. 36 pp. 5-6; Depo. pp. 97-98. Plaintiff said the review was "in sharp contrast" to the "overwhelmingly positive feedback" that had been "consistently provided" by "external clients." Ex. 36 p. 5. He closed by saying the review was " a classic example of 'corporate terrorism,' plain and simple, focused on destroying employee career objectives." Ex. 36 p. 5. Although Plaintiff had received salary increases of 4.87 per cent for 1998, 5.6 per cent for 2000,[17] and 6 per cent for 2001, he received no increase for 2002. Ex. 35; Depo. pp. 92-93.

Plaintiff's position description required him to "maintain a direct labor level of 85 percent or greater."[18] Ex. 36 p. 9; Depo. p. 98. By November of 2001, however, Plaintiff's billable hours had started to fall. Depo. pp. 99-100. His line manager, Greg Holt, solicited work for Plaintiff from Kevin Colligan, and the two agreed on its parameters. Ex. 37 messages 1-3; Depo. 100-01. Plaintiff responded to the job proposal as follows:

I can do this work, but I do not know what Kevin would perceive as Principal Staff level. In the past, he has been very subjective and arbitrary in his opinions regarding my work contributions. So I do not expect his assessment of whatever I do would be fair. To address this fairness issue, I can look at any *CTC* template on appropriate [statement of work], but I feel this is a no win situation.

Ex. 37; Depo. pp. 100-01. Plaintiff apparently did do the work, however. Ex. 38 p. 1.

CTC provided for weekly significant item reports. Depo. pp. 101-02; Ex. 38. In his November 22, 2001 report, Plaintiff wrote that Defendant's management system had "led *CTC* Line Management to give 'cruel and unusual punishments' to [Plaintiff]." Ex. 38 p. 1; Depo. p. 102. In his January 10, 2002 report, Plaintiff wrote as follows:

*CTC* requires its employees to consistently meet and exceed position requirements. *CTC*

---

[17] Plaintiff received no raise for 1999 because he had been on leave for most of 1998. Depo. p. 92.

[18] The Court notes that Plaintiff did concur with the position description "subject to and read with [his] notes [in response to his] Exempt Performance Appraisal." Document No. 36 p. 9.

Line Management also instruct technical staff not to give a cadillac [sic] when the client is willing to pay only for a chevy [sic]. I am not sure whether these two positions represent a disconnect or a doublespeak. I hope *CTC* has a good explanation.

Ex. 38 p. 7 column 3; Depo. p. 103. In a report dated May 5, 2002, Plaintiff wrote the following about recent weld test results:

This result "further illustrates how my former [line manager] (Greg Holt) has used unfair, dishonest and partiality as a means to target (he rated my technical work as 'very poor') and victimize me (through salary action) in my 2001 annual performance appraisal.

Ex. 38. p. 9.

On January 4, 2002, Plaintiff submitted a seventeen-page single-spaced memorandum to Marjorie Gregory, an EEOC investigator, in rebuttal to Defendant's response to his EEOC complaint. Ex. 39; Depo. pp. 103-05. Plaintiff claimed that "race and national origin [were] the 'probable cause' for *CTC*'s discriminatory practices," and that CTC had engaged in a "broad pattern" of Title VII violations. Ex. 39 pp. 1, 14; Depo. p. 103-04. He said that he had "avoided directly stating that race and national origin [were] the probable cause" of his problems in his earlier written communications to CTC due to his "self-discretion, sensitivity and restraint for such issues." Ex. p. 14; Depo. pp. 103-04. He also said that if his "interpersonal skills were the real issue, *CTC* would have provided [him] with appropriate training and counseling opportunities that would have enabled [him] to overcome this alleged behavior." Ex. 39 p. 3.

Plaintiff stated that Defendant was "required by the EEO Act[] to offer its employees and continue to provide its employees the maximum opportunity to achieve challenging and fulfilling assignments and professional growth" commensurate with the employees' experience and abilities, and to "appropriately compensate the employee[s] in return for the services rendered," and suggested that CTC's alleged pattern of discrimination was aimed at keeping Plaintiff, a person "of Indian origin,"

25

from promotion to "the prestigious *CTC* Leadership Team." Ex. 39 pp. 12, 16; Depo. pp.103-04.

Plaintiff reiterated the specific actions that have been described above, and stated that these incidents of alleged discrimination were a "devious and ingenious attempt by *CTC* to 'light as many as fires as possible' in order to tire [him] 'fighting several fires,' and thereby dissuade and discourage [his] crusade against workplace discrimination based on prejudice, race and national origin." Ex. 39 p. 9; Depo. pp. 103-04. He said that Defendant's actions were "in essence a new form of corporate terrorism and blatant attempts that forcefully seek capitulation." Ex. 11; Depo. pp. 104-05.

In 2002, Plaintiff had a new line manager named Dan Winterscheidt. Depo. pp.106,108; Wintersheidt Aff. ¶ 2. On February 14, 2002, Plaintiff sent Winterscheidt a proposal for a "Truth in Position Description," which he analogized to a truth in lending statement. Ex. 40; Depo. pp. 105, 186-87. It read as follows:

> *CTC* affirms that is has exercised thoughtful planning to ensure that *CTC* employees in the same or similar position(s) receive similar position description, consistent with the demonstrated knowledge, skills and abilities of the individual employee and his/her the most recent annual compensation award. *CTC* further affirms that it has in place checks and balances that also ensure a fair, honest and impartial method to assess employee performance. *CTC* would use the following mutually agreed guideline matrix (see attached)[19] to transparently measure and assess employee performance, and based on the assessment determine the appropriate need for additional employee training, employee assistance, wage increase, promotion or termination.

Ex. 40; Depo. p. 105.

On February 21, 2002, Plaintiff e-mailed Winterscheidt to request a re-evaluation of his 2001 performance review. Ex. 41; Depo. pp. 105-07; 116-17. He cited new welding reports that he claimed supported his assertion that he had been unfairly criticized for his welding work in the 2001 evaluation,

---

[19] The matrix to which the text refers consisted of the one to five rating scale already employed by Defendant, with added columns indicating either improvement, consistent performance, or regression for every measured category. Ex. 40 p. 3.

26

which he stated had been "extremely biased and unfair." Ex. 41; Ex. 36 p. 5; Depo. pp. 105-07. Winterscheidt refused to conduct a re-appraisal, but Plaintiff and Winterscheidt did arrange to meet to discuss modifications to Plaintiff's position description, and to review CTC's "nomination [for promotion] procedures." Ex. 44; Depo. p. 111. In discussing his quest for promotion, Plaintiff wrote the following:

> In my well considered opinion, I meet or exceed all performance requirements for the next level. I also know that the Management Team has determined that it is not so. However, I truly believe that the determination of the Management Team is unfortunate, is based on subjective assessment, and is unfair to minority employees who have demonstrated exceptional contract performance. Following this conclusion, I have requested through you a review of the *CTC* nomination procedure so that it would become fair to minority employees.

Ex. 44.

The EEOC sent Plaintiff a right to sue letter on March 19, 2001, stating that it was "unable to conclude that the information [provided by Plaintiff] establishe[d] violations of the statutes" and giving him 90 days from receipt of the notice in which to file suit. Document No. 1 at 3:-2-cv-162 Ex. A; Ex. 3 p. 2 ¶ 2, p. 7.

Winterscheidt decided to conduct an out-of cycle six month review covering November 1, 2001 through April 30, 2002. Ex. 45 p. 3; Depo. p. 112; Winterscheidt Aff. He also requested that Plaintiff advise him of Plaintiff's "specific short or long term goals . . . ." Ex. 45 p. 3. Plaintiff responded that he could not perform his current position statement's goals of commercializing his patents and developing new business without support from CTC, and stated that he had not been permitted to attend conferences and seminars for the previous six years, making it "totally unreasonable to even expect that [he] could do business development." Ex. 36 p. 8; Ex. 45 p.2. He said that his short term goals were immediate if not retroactive promotion to Principal Technical Advisor, since he met or exceeded all

27

position requirements, and becoming NCEMT Program Manager. Ex. 45 p.2. Plaintiff's long term goal was promotion to CTC Executive Management. *Id.*

Plaintiff also provided a list of people from whom Winterscheidt could seek evaluations. *Id.* Plaintiff warned that "[i]n the past, [he had] received totally unfair EPF [Exempt Performance Feedback] from Kevin Colligan, Paul Konkol, Greg Holt and Dick Henry"; that he did "not expect that they [would] provide a fair feedback"; and that if Winterscheidt nonetheless did receive feedback from them, that CTC should make "doubly sure that their feedbacks are fair, honest and impartial." *Id.*

In conjunction with the out-of-cycle review, Plaintiff filled out an EPF form on himself. Ex. 45, pp. 4-6. He gave himself the top rating, a five, for six of the seven performance categories on the form, and gave himself a four for the seventh category, ability to communicate verbally, saying that he "communicate[d] just fine, if one is interested in what [he had] to say, and act[ed] fairly and professionally!" Ex. 45 p. 6. By contrast, Winterscheidt gave Plaintiff an overall rating of two, although he suggested that "[w]ith continued improvement [Plaintiff's] performance could be evaluated as Level 3" at the November, 2002 review. Ex. 49 p. 4; Depo. pp. 117-19.

Winterscheidt found that Plaintiff "still tend[ed] to dwell on past perceived transgressions and assume[] an adversarial approach when dealing with CTC management," and that he "exhibit[ed] a significantly distorted perception of his leadership abilities," as he "simply [had] not demonstrated the requisite leadership, particularly the people skills required for [management] positions." Ex. 49 pp. 3, 5; Depo. pp. 117-18. Winterscheidt also noted that although Plaintiff had the ability to "perform manufacturing cost analysis," he would not do so "unless he receive[d] additional compensation." Ex. 49 p. 5; Depo. p. 119. Winterscheidt declared that position to be "absolutely unacceptable"; that it had to be "corrected immediately"; and that "cost analysis is part of manufacturing/engineering work." Ex.

28

49 p. 5.

Attached to the evaluation was a position description. Ex. 49 p. 6; Depo. p. 119. It listed performance goals which included acting as a "project consultant for manufacturing cost analysis"; maintaining a "Direct Labor level of 85% or greater"; developing a "'team work' philosophy"; and "work[ing] hard not to alienate coworkers." Ex. 49 p. 8; Depo. p. 119. At the end of the document were signature lines for Winterscheidt as preparer and, after the word "Concurrence," for Plaintiff. Ex. 49 p. 8. Plaintiff refused to sign because the position description required him to use his MBA skills without any increase in salary. Depo. p. 137.

On May 17, 2002, Plaintiff responded to his latest evaluation with an eight-page single-spaced memorandum. Ex. 52; Depo. p. 122. Plaintiff wrote that he "was entirely disappointed when [Winterscheidt] did not take the latest opportunity to undo past misperceptions, but continued with them to primarily inflict severe economic hardship while denying [Plaintiff] opportunities for career growth." Ex. 52 p. 1. He said that he "[did] not know why [he was] perceived as confrontational and disruptive to team building efforts," and that any assertion that he had adopted an adversarial approach to CTC management was "absolutely not true, far-fetched and simply untenable," since he had no power over management, and only the powerful can "adopt or resort to" an adversarial approach. *Id.* pp. 1-2; *see* Ex. 49 p. 3. Plaintiff also said that he was "not arrogant at any time." Ex. 49 p. 5.

Plaintiff criticized Winterscheidt throughout the memorandum. In responding to Winterscheidt's assessment of Plaintiff's leadership skills, Plaintiff wrote, "Perhaps, you are unable to recognize true leadership." Ex. 52 p. 2 ; Depo. p. 124. In response to Winterscheidt's suggestion that Plaintiff "keep e-mail correspondence short and non-confrontational," Ex. 49 pp. 4, 8, Plaintiff asked, "As a Line Manager, do you have to fully let go of your objectivity when you deal with e-mails from a minority

29

employee?" Ex. 52 p. 3; Depo. pp. 125-26. Plaintiff went on to write that he was "truly dismayed at [Winterscheidt's] ability to fault [Plaintiff] and punish [Plaintiff] for others' failings, including [Winterscheidt's] own." Ex. 52 p. 4.

Plaintiff said that Winterscheidt's conclusion that Plaintiff's performance could rise to Level 3 at his November, 2002 evaluation "illustrate[d] [his] prejudice and predisposition, and thereby explicitly violate[d] EEO Act." *Id.* at 6; *see* Ex. 49 p. 4. Regarding Winterscheidt's conclusion that Plaintiff was not prepared for promotion to a management position, Ex. 49 pp.3, 5, Plaintiff wrote: "Instead of objectively addressing those goals, you have chosen to indict me that my people skills and leadership abilities are not adequate even to aspire for those goals. In doing so, *inter alia*, you also explicitly violated the EEO Act." Ex. 52 p. 6.

Regarding the use of his MBA skills, Plaintiff stated that the "Principal Staff position description [did] not require [him] to provide value-added services, over and beyond regular (formal) engineering education." *Id.* at 3; Depo. p. 125. He claimed that Defendant's refusal to provide extra compensation for his "value-added services" was "in contravention of the EEO Act." Ex. 52 p. 3; Depo. p. 125. He then wrote as follows:

> I perceive the demand to provide such value-added services without appropriate changes to position description and increase in compensation as both an illegal practice towards a minority employee in violation of the EEO Act, and a surreptitious attempt to introduce and perpetuate slavery in the American workplace. Slavery, in any way, shape or form is illegal.

Ex. 52 p. 3; Depo. p. 125.

Plaintiff stated that there was no "common understanding of [his] position and performance standards expected," and that his latest position description, Ex. 49, pp. 6-8, was "a pretentious exercise in allowing discretionary appraisal based on perceptions and not facts, and perpetuating the 'smoke and

30

mirror' schemes beyond any one's belief!" Ex. 52 p. 5. He went on to "insist on a Truth in Position Statement," and that CTC "provide specific direction for each line item in the position description and also clearly state what would be considered insubordination in each case." *Id.* at 6; Depo. pp. 126-27.

Plaintiff concluded by expressing the hope that Winterscheidt recognized that "*CTC* [was] a project based professional services company that receive[d] most of its funding from Federal, State and Local Government, and [was] not a correctional facility to vindictively re-engineer the professional behavior of a well-educated minority employee with exceptional on-the-job performance." Ex. 52 p. 7. Plaintiff then vowed to "remain fully committed to vehemently and vigorously defend against Corporate Terrorism while upholding the continuous need for fair, objective and equal treatment of minority employees as per the EEO Act." *Id.* He closed by stating that it was "high time *CTC*, as one of the best Companies to work in Pennsylvania, demonstrated *real* Leadership for fair and equal treatment of a valuable minority employee." *Id.* at 8 (emphasis in original).

By May of 2002, Plaintiff's current assignment was coming to an end and he needed new tasking. Ex. 50; Ex. 51; Depo. pp. 119-21. He stated that without such "project support" he would be "forced to charge to overhead." Ex. 51; Depo. p. 121. As of June 28, 2002, he had no scheduled tasking. Ex. 54.

Plaintiff believed that it was his line manager's job to find him work; that if program managers refused to work with Plaintiff the line manager had to "find out" why; and if the managers refused to employ Plaintiff because he was difficult to work with, the line manager was obliged to "resolve the issue," if necessary by sending Plaintiff "to some programs so that [he] could have improved [his] behavior." Depo. pp. 98-99; 121, 131. Winterscheidt, Plaintiff's line manager, "identified two projects," one of them his, for which Plaintiff could have performed cost analysis. Ex. 53 message 3;

31

Depo. pp. 127-28, 135. Plaintiff, however, would not "use his 'MBA skills' without first getting a pay raise." Ex. 53 message 3; Depo. p. 128.

On June 17, 2002, Plaintiff filed his first lawsuit at 3:02-cv-162. Ex. 3. He alleged that Defendant had discriminated against him since May of 1995 "with regard to his salary, incentives, benefits and assignments on the basis of his race and national origin"; that Defendant had "paid other similarly situated Caucasian engineers with less experience and education than Plaintiff, higher relative compensation than Plaintiff, and higher percentage merit increases" and given them "better assignments"; that although Plaintiff had prepared posters and served as a project manager, "he was not permitted to make the presentations and attend the symposiums"; that "Defendant used code words such as 'lack of interpersonal skills' in its performance evaluations of Plaintiff"; and that Defendant further discriminated against Plaintiff by " its decision to preclude him from making presentations due to his inability to speak the English language as fluently as native born Caucasian employees, which led to his receiving lower compensation, lower merit increases, and failing to be promoted." Ex. 3 p. 4 ¶¶ 9-12. He also alleged that Defendant had retaliated against him with its performance reviews of October 26, 2001 and April 26, 2002 for filing "an internal E.E.O.C. Complaint of discrimination . . . in accordance with company policy and procedures" on July 5, 2001, and a "similar charge with the E.E.O.C. at its Pittsburgh office which [was] the subject matter" of Count One of the complaint at 3:02-cv-162. Ex. 3 pp. 5-6 ¶¶ 16-22.

On June 27, 2002, Richard Pirrotta, Winterscheidt's supervisor, sent a memorandum to Plaintiff responding to Plaintiff's rebuttal of Winterscheidt's out-of-cycle performance review. Ex. 55; Depo. 130-31. It criticized Plaintiff for not using the information from the review "to address and correct what were largely identified as interpersonal deficiencies" and instead "drafting another lengthy

32

rebuttal in which [he] blame[d] everyone else . . . for [his] own shortcomings." Ex. 55. It noted that in his memo Plaintiff had "disparage[d] three respected members of CTC management [Mollard, Henry and Winterscheidt]," and advised Plaintiff to "focus [his] energies on correcting [his] shortcomings . . . and away from blaming others . . . ." Ex. 5; Depo. pp. 130-31.

On July 8, 2002, Winterscheidt e-mailed Plaintiff asking him to identify projects to which he felt he could "make a meaningful contribution . . . ." Ex. 56; Depo. pp. 134-35. Plaintiff wrote back the next day, asking Winterscheidt to "identify what [he] (or *CTC*) would consider as meaningful contribution, consistent with [Plaintiff's] position description and overall compensation." Ex. 56; Depo. pp. 134-35. On July 11, 2002, Plaintiff wrote in his weekly report that he did not have full time project tasking; that he had advised Winterscheidt that he was "currently functioning without a mutually agreed position description"; and that he had been asked to do an economic analysis, but that such analysis would require "appropriate changes to [his] position description and compensation per EEO Act." Ex. 57; Depo. pp. 136-37. Winterscheidt e-mailed Pirrotta on July 12, 2002, to suggest that Plaintiff should be told that if he persisted in his refusal he would be reclassified as a part-time employee. Ex. 53.

On July 22, 2002, Winterscheidt memorialized a conversation with Plaintiff held earlier that day in which Winterscheidt had advised Plaintiff that if he refused to work on the two cost analysis projects that were then available to him CTC might not have adequate work for him. Ex. 59; Depo. 137-38. In his weekly report dated July 25, 2002, Plaintiff said he viewed the e-mail and conversation as "'threatening' and 'in retaliation'" for his "written complaints and professional disagreements with *CTC*," and that he had asked Winterscheidt to "solve the root cause of such issues, and not resort to either threats or retaliation." Ex. 60; Depo. 138-39. He also reported that he had not received a raise,

although he had expected one from his out-of-cycle review, and said that he was "unable to understand why *CTC* [was] using perceptions (instead of reality) in refusing to adequately recognize [his] technical contributions [in developing patentable technology] with a promotion and appropriate compensation." Ex. 60; Depo. p. 138.

On July 31, 2002, Winterscheidt gave Plaintiff a memorandum in response to Plaintiff's July 25, 2002 report. Ex. 61; Depo. pp. 139-40; Winterscheidt Aff. It was apparently either not signed or not initialed. Depo. pp. 142-43. Winterscheidt advised Plaintiff that "[a]ttainment of patents [was] not, in itself, a sufficient basis for promotion"; that if CTC could not "reach consensus" with an employee on his position "the Line Manager sets the position description"; and that the description in Ex. 49 pp. 6-8 was the one by which Plaintiff's performance would be measured at his next review. Ex. 61; Depo. pp. 139-40; Winterscheidt Aff. Winterscheidt instructed Plaintiff to "contact [chief scientist] Joe Pickens . . . and then propose to [Winterscheidt] an overhead project with definite cost (labor hours), schedule and deliverables." Ex. 61; Depo. pp. 140-41 (emphasis in original); Winterscheidt Aff. Winterscheidt also advised Plaintiff to "focus [his] energies on [his] work and [his] performance." Ex. 61; Winterscheidt Aff.

Plaintiff did not have full-time project tasking through September 5, 2002. Ex. 62 pp. 3, 7, 11; Depo. pp. 141-42. Plaintiff used his September 5, 2002 weekly report to submit a formal complaint against Winterscheidt for "abusing the *CTC* memorandum process" by sending Plaintiff "a signed copy of a memorandum [Ex. 61] more than one month after it [was] dated." Ex. 62 p. 11; Depo. pp. 142-43. Plaintiff claimed that this had caused him "mental torture and agony" and asked CTC "to investigate [the] matter, and do the needful." Ex. 62 p. 11 column 3; Depo. pp. 142-43. Plaintiff also said that his latest position description "explicitly violate[d] the EEO Act"; that he could "not abet CTC break the

34

law" by agreeing to it; and that the memorandum's discussion of the position description was "another veiled threat." Ex. 62 p. 11; Depo. pp. 142-43.

Plaintiff remained without full-time project tasking into October of 2002. Ex. 62 pp. 15, 18, 21, 24; Depo. p. 143. As of October 3, 2002, Plaintiff had taken the position that Winterscheidt could not perform Plaintiff's annual appraisal because Winterscheidt was under investigation for "failing to initial his memo." Depo. p. 144. By October 17, 2002, Plaintiff was charging time to overhead; by October 24, 2002, his overhead charge had reached 50 percent. Ex. 66 p. 2; Ex. 67 p. 2; Depo. pp. 154-55. Within CTC there was a "negative association" to being on overhead fro an employee at Plaintiff's level. Depo. p. 139.

During this period, Winterscheidt solicited feedback from eight of Plaintiff's co-workers in preparation for Plaintiff's annual performance review. Ex. 65, Winterscheidt Aff. One EPF and an e-mailed summary in lieu of an EPF were extremely positive. *See* Ex. 65 pp. 1, 19-21. Three EPFs were generally positive, *see* Ex. 66 pp. 10-18, although Plaintiff was criticized for lacking a view of the "big picture," *id.* at 10, 17, and his lack of teamwork. *Id.* at 17-18. The three remaining EPFs depicted an average to below average employee, *see id.* at 4-9, 22-24, who needed to work on his "interpersonal skills" and "attitude." *Id.* at 4, 6, 24. Two of these reviews also complained about Plaintiff's behavior during meetings with vendors. *Id.* at 4, 6, 22. One of the reviews stated that Plaintiff had refused to assist in the preparation of a "life cycle analysis," since "he [was] not compensated for [that] type of work." *Id.* at 23.

When confronted during his deposition in 2006 with the negative comments contained in the EPFs discussed above, Plaintiff said he viewed them as "retaliation," and that "[a]nything that happened after January 2001 was basically retaliation." Depo. pp. 145-53. However, Plaintiff had "no idea"

35

whether any of the people who had provided evaluations were aware that he had filed a complaint with EEOC. *Id.* at 154.

Winterscheidt presented Plaintiff with his annual review on October 31, 2002. Ex. 68; Depo. p. 156; Winterscheidt Aff. The review noted that Plaintiff had continued to refuse work that required his MBA skills and that this was "unacceptable." Ex. 68 p. 5; Winterscheidt Aff. It stated that this refusal, "combined with [Plaintiff's] argumentative nature [had] made it difficult to convince [program managers] to assign tasking to him," and that therefore he had "only 30% tasking." Ex. 68 p. 5, Winterscheidt Aff. Plaintiff was then advised to:

- Immediately cease his combative style.
- Immediately cease dredging up perceived past transgressions
- Immediately cease refusing assignments that involve cost analysis
- Immediately cease refusing to communicate with any member of CTC's management team
- Take personal responsibility for success at CTC
- Listen to and follow line manager's advice to improve performance
- [and that] Tasking shortfall must be rectified immediately.

Ex. 68 pp. 4-5; Depo. pp. 156-57; Winterscheidt Aff. The position description that accompanied the review retained the cost analysis requirement that Plaintiff had previously rejected, and added a requirement that Plaintiff "[a]chieve (within 90 days) and maintain a Direct Labor level of 85% or greater." Ex. 68 p. 8; Winterscheidt Aff. Plaintiff's position description had previously merely required that he maintain the 85 percent level. *See* Ex. 49 p.8.

Plaintiff refused to sign either the performance review or the accompanying position description and, in fact, refused to meet with Winterscheidt to discuss the appraisal unless Winterscheidt changed the entire document. Depo. pp. 158-59. In his weekly report from November 7, 2002, Plaintiff stated that he was "currently functioning without a mutually agreed position description"; had charged 50 percent of his time to overhead; and had requested that Winterscheidt "take necessary and appropriate

36

action to transfer [him] to another Dept. where [he] would not be subject to harassment, as this [was] adversely affecting [Plaintiff's] long-term health." Ex. 70; Depo. pp. 160, 162, 165.

Winterscheidt had a meeting with Plaintiff of November 8, 2002,[20] where Winterscheidt again "tried to get him to sign the appraisal." Ex. 71 p. 1; Depo. pp. 160-62; Winterscheidt Aff. Plaintiff again refused. Ex. 71; Winterscheidt Aff. Plaintiff also refused to sign the position description without a "truth in position description." Ex. 71 p. 2; Depo. pp. 161-62; Winterscheidt Aff. Winterscheidt "pointed out" to Plaintiff that if he was to continue charging time to overhead he had to propose a well-defined overhead project," and suggested some possibilities. Ex. 71 p. 2; Winterscheidt Aff.

In an e-mail dated November 15, 2002, Winterscheidt reiterated to Plaintiff that he had to develop an overhead project if he was going to charge his time to overhead. Ex. 73; Depo. pp. 161-62; Winterscheidt Aff. All Winterscheidt required "was a write-up describing the task to be performed, timeframe, and hours to be charged to overhead." Ex. 73; Winterscheidt Aff. Plaintiff responded by e-mail, refusing to provide the required materials unless Winterscheidt furnished him with a "template of [his] expectations [that] would allow [Plaintiff] to meet or exceed [Winterscheidt's] expectations." Ex. 73; Winterscheidt Aff. Plaintiff continued as follows:

> If I do not know your expectation ahead, I perpetually run the risk of not meeting your expectation. This is a "Catch 22" situation that is one of the root causes of the harassment I am suffering at your hands. I consider that I should know your expectation ahead, as a necessary pre-requisite for me to perform my work at CTC.

Ex. 73; Winterscheidt Aff.

On November 19, 2002, Plaintiff was offered purely technical work as lead author of a project's final report by the project leader, Mehmet Gungor. Ex. 74; Depo. pp. 163-64. The authors were to be

---

[20] Although Plaintiff subsequently claimed in his unsworn response to Defendant's statement of undisputed material facts, that he "could not recall such an event," Document No. 67 ¶ 142, Plaintiff had previously stated under oath that he did in fact remember the meeting. Depo. p. 161.

37

Plaintiff, Chengming Wang, Troy Tack, Ibo Ucok, and Gungor. Ex. 74. On November 20, 2002, Plaintiff e-mailed Winterscheidt to say that "[b]ased on his prior experience with [Gungor], [he was] not too keen to take up this work." Ex. 74; Depo. pp. 163-64. He said that as a program manager, Gungor "claim[ed] certain territorial turf, and brook[ed] no suggestions for continuous improvement," and that "[u]fortunately, [Winterscheidt] also seem[ed] to subscribe to this view." Ex. 74; Depo. pp. 163-64. Plaintiff said that the project "could end up as a thankless job, and frankly, [did not] provide adequate motivation for [him] to jump in joy!" Ex. 74. Plaintiff concluded that "[d]espite [his] above serious misgivings, [he] would do the work if [*CTC*] could make sure that [Gungor] would behave in a professional manner, consistent with *CTC* policies, including its core values and beliefs." Ex. 74; Depo. pp. 164-65. Plaintiff later explained that he had problems with Dr. Gungor "[b]ecause he was not ready to take suggestions to improve himself." Depo. p. 164.

Plaintiff's weekly report from November 21, 2002 confirmed that he was still charging 50 percent of his time to overhead, and that he still sought a transfer to another Department. Ex. 75 p. 2; Depo. p. 165. He also referred to health issues as follows:

Although LM [line manager] distrusts my health condition as I haven't availed any sick leave . . . I was disqualified [that morning] to donate blood for a medical reason. This is the first time such an occurrence has happened to me ever. LM may consider this disqualification as an adequate (although indirect) proof that my health has begun to noticeably suffer lately. I recognize that LM and *CTC* management may continue to distrust my health condition, but that is their choice.

Ex. 75 p. 2.

Plaintiff's weekly report dated November 27, 2002 again reported a charge of 50 percent of his time to overtime, and repeated his request for a transfer "to another Dept. where [he] would not be subjected to harassment, as this [was] adversely affecting [his] long-term health." Ex. 75 p. 5; Depo. pp. 165-66. Plaintiff also announced that he was "[p]roceeding to India on vacation." Ex. 75 p. 5;

38

Depo. p. 166. Plaintiff expected to be gone until December 27, 2002, and to return to work on December 30, 2002. Ex. 75 p. 6; Depo. p. 166.

Upon Plaintiff's return from India, he generally remained without full-time project tasking and, indeed, such tasking had "dropped from 50 percent to 30 percent." *See* Ex. 75 pp. 11, 14; Ex. 77; Ex. 78 p. 2; Ex. 80 pp. 2, 5, 8; Depo. pp. 168, 172-73; Winterscheidt Aff. He continued to use his weekly reports to complain about Defendant's actions. For example, on January 9, 2003, he wrote that "LM continue[d] to harass [Plaintiff] by not assigning specific work consistent with [Plaintiff's] position description" and that he "was not aware of any action" on his transfer request. Ex. 75 p. 14. Plaintiff wrote that the "above (in)actions continue[d] to adversely affect [his] health and general wellbeing." *Id.* On January 23, 2003, in relation to unsuccessful welding tests that were conducted while he was on vacation. Plaintiff wrote, "I am appalled at the prejudice of the *CTC* Chief Scientist that his direction implies towards a fellow (but minority) employee's contributions in diligently addressing client needs." Ex. 78 p. 3; Depo. pp. 168-69.

On January 28, 2003, Winterscheidt e-mailed Plaintiff to ask whether it was "OK" with Plaintiff if Winterscheidt "sen[t] out his resume to prospective [program managers]." Ex. 79; Depo. p. 169. On January 29, 2003, Plaintiff replied as follows:

> It is OK with me if you send my resume out to whomsoever you want at *CTC*. However, as *CTC* has not recognized my MBA qualification (despite the relevant provisions of *CTC* EEO policy to the contrary), it would be appropriate if my tasking is restricted to my technical background, and the prospective [program managers] are made aware of this fact. Furthermore, you may also consider providing copies of all my performance appraisals along with my respective rebuttals as well, so the prospective [program managers] (or other *CTC* persons) are fully aware of my technical strengths and personal weaknesses as well.

Ex. 79; Depo. pp. 169-72. Plaintiff subsequently explained that "recognize" meant give him a promotion and a pay raise, stating that, "[if] you want a Lexus for the price of a Camry, you're not

39

going to get it." Depo. pp. 170-72.

Winterscheidt sent brief e-mails, with Plaintiff's resume attached, to Kathy Carr, Tom Creeden, James Fisher, Mehmet Gungor, Ilbrahim [sic] Ucok, Glen Nickodemus; Edward Fasiska, Robert Dax, Timothy Friedhoff, Suhas Vaze, Urban DeSouza, Larry Knipple, Georgette Kotsagrelos and Mustafa Gudu. Ex. 81; Winterscheidt Aff. As of February 6, 2003 he had received seven replies, none of which offered Plaintiff any work. Ex. 81; Winterscheidt Aff. Winterscheidt e-mailed Plaintiff that day, advising him that Winterscheidt could not find "any additional technical tasking"; stating that the "[t]he only thing [he could] think of was starting the Single-Melt Ti economic analysis earlier than originally planned"; but also stating that as program manager of the project he "would not be comfortable" assigning the work to Plaintiff "unless [Plaintiff] were to assure [Winterscheidt] that [he] would use all of [his] abilities to do the best job possible . . . ." Ex. 82; Depo. p. 174. Plaintiff responded as follows:

I appreciate your trust in me, despite your conditions! However, in the past I have made my positions quite clear to you as well as *CTC*. This is a legal issue and it needs to be resolved suitably. Please understand that I can not abet *CTC* not follow the law.

Secondly, I am surprised that under the current circumstances that you have been unable to find me tasking. I perceive (remember that *CTC* doesn't have an exclusive right to perception; I could also perceive *CTC* the way I want; the only difference is my perceptions are supported by facts!) it is not the lack of tasks, but a lack of will to follow the law that is precluding *CTC* from finding appropriate task.

Ex. 82; Depo. pp. 174-75 (explaining that the legal issue was payment for the use of Plaintiff's MBA skills, and that non-payment was a violation of the Equal Employment Opportunity Act).

On approximately February 20, 2003, Winterscheidt e-mailed Plaintiff to set up a meeting to discuss performance. Depo. p. 175. Plaintiff, claiming that he had "nothing to discuss" about Winterscheidt's or Jones's performance, declined the invitation. Ex. 83; Depo. pp. 175-76.

40

Winterscheidt explained that he wanted to discuss Plaintiff's performance. Ex. 83; Depo. pp. 175-76.

Plaintiff responded as follows:

> Well, if you had wanted to discuss my performance that is OK with me. However, if you want to discuss your perception of my performance, I am not too inclined to cooperate, as you have been using those opportunities to misrepresent facts. I just can not keep on repeating that you continue to unfair, dishonest and partial. Can you assure me that you would only discuss my actual performance (not your or *CTC*'s perceptions of it), and you would be honest, fair and impartial as required by *CTC* ?

Ex. 83; Depo pp. 175-76. Winterscheidt informed Plaintiff that the meeting was mandatory and would

be charged to overhead. Ex. 83; Depo. pp-175-76. Regarding the mandatory nature of the meeting,

Plaintiff subsequently said the following:

> The thing is this is the way they treated your fellow employee. It does not matter if you have the best qualifications, best education, best accomplishments. "You are my slave. When I ask you to come, you should come. I am your boss." I don't know where they get this tendency. And these people are supposed to be working for the 21st Century.

Depo. p. 176.

The meeting was held on February 20, 2003, with Plaintiff, Winterscheidt and Jones present. Ex. 85; Depo. pp.177-78; Jones Aff.; Winterscheidt Aff. Winterscheidt handed Plaintiff a memorandum notifying him that he was on a 90-day probation. Ex. 84; Ex. 85 p. 1; Depo. pp. 177-78; Jones Aff. It stated that Plaintiff had made "minimal improvement in the areas identified in [his last] performance appraisal" and that he had failed to "achieve a direct labor level of 85%" within the 90-day time limit established by his current position description. Ex. 84 p.1; Winterscheidt Aff.. It then provided a "Performance Improvement Plan" with sixteen "measurable goals" that Plaintiff was expected to achieve. Ex. 84 p. 2; Winterscheidt Aff. The goals included signing Plaintiff's position description within five days; "demonstrat[ing] a cooperative rather than combative style"; ceasing all "reference to past (perceived) transgressions"; "achiev[ing] and maintain[ing] a direct labor level of

41

at least 85%"; accepting all proffered tasking, from whatever, source, "including those that involve cost analysis, use of MBA skills, or intellectual property issues"; "[c]omplet[ing] and submit[ting] at least one business proposal in the next 90 days"; and ceasing to "blam[e] others for [Plaintiff's] lack of success at *CTC*." Ex. 84 pp. 3-4; Winterscheidt Aff.

The memorandum advised Plaintiff that during the next 90 days his performance would be monitored and that "if at any time it [was] determined that [Plaintiff] was not making efforts to meet performance requirements, further disciplinary action up to and including termination [would] be taken." Ex. 84 p. 3; Winterscheidt Aff. It further stated that "[c]ontinued performance without drastic improvement [was] absolutely unacceptable." Ex. 84 p. 4; Winterscheidt Aff. There was then a line stating "I have read and understand the terms and conditions of this memorandum as stated above" followed by a line for Plaintiff's signature. Ex. 84 p. 5; Winterscheidt Aff. Plaintiff refused to sign. Ex. 84 p. 4; Ex. 85 pp. 6-7; Depo. p. 178; Jones Aff.

Plaintiff also refused to sign his position description without a truth in position statement and said that he would not comply with anything in the Performance Improvement Plan. Ex. 85 pp. 4, 6; Depo. pp. 180-3; Jones Aff. He said that he would not acknowledge the Performance Improvement Plan until CTC "acknowledged his technical accomplishments, corrected [its] treatment of him, and got rid of the prejudice." Ex. 85, Depo. p. 183; Jones Aff.

On February 21, Plaintiff asked Winterscheidt if he should change his e-mail signature to "Principal Staff on Probation," and write that on his business cards. Ex. 86; Depo. p. 184. On February 24, 2003, Plaintiff began to use a "Claimer" on his e-mail that read as follows:

This e-mail is based on the knowledge, skills and abilities that I obtained during my self-financed MBA education at Cornell University. I am using this knowledge, skills and abilities set *pro bono*, primarily to demonstrate my extreme goodwill to *CTC*, its programs and their credibility.

42

Ex. 88; Depo. p186. He found it "a little creative." Depo. p. 186. Plaintiff was terminated that afternoon. Depo. 185-86.

On May 19, 2003, Plaintiff filed a charge with the EEOC alleging that his termination was in retaliation for his prior EEOC complaint. Document No. 11, 3:02-cv-162 ¶ 3. Stating that the EEOC investigation could provide "the basis for filing an Amended Complaint, " Plaintiff moved for an "administrative discontinuance" of his first lawsuit without prejudice. *Id.* at ¶¶ 4-5. On June 24, 2003, Judge Robert J. Cindrich granted Plaintiff's motion. *Id.* at p. 3.

On September 9, 2003, the EEOC forwarded a second right to sue letter to Plaintiff. Document No. 1 ¶ 2, Ex. A. Plaintiff filed the instant action on December 5, 2003 seeking, *inter alia*, recovery of lost wages, compensatory damages "for all non-pecuniary losses," punitive damages, costs, and "[a] promotion to a position commensurate with [Plaintiff's] skills."[21] Document No. 1. Defendant filed its motion for summary judgment on October 27, 2006. Document No. 53. Plaintiff filed his consolidated motion for summary judgment on November 13, 2006, Document No. 63, and his reply to Defendant's motion on December 4, 2006. Document No. 66. Defendant filed its reply to Plaintiff's motion on December 11, 2006. Document Nos. 71-72. In his response, Document No. 66, Plaintiff stated that he was "agreeable should the Court, based primarily on Defendant's admission of ARE # 15 [Defendant's Ex. 15], *sua spontae* [sic] decide to reactivate Discrimination Complaint (02-162) in the interest of justice and judicial economy." *Id.* at 3. The Court took Plaintiff at his word and on March 5, 2008, notified Plaintiff of its intent to enter summary judgment against Plaintiff on the additional claims of ongoing pay discrimination, ongoing retaliatory harassment, ongoing denial of

---

[21] Plaintiff states that such a position would be "[s]omething like a vice president of the company." Depo. p. 19.

opportunities for professional development through participation in conferences and presentations, and ongoing failure to promote and gave Plaintiff until March 24, 2008 to respond. Document No. 77. Plaintiff filed his response on March 24, 2008. Document No. 78.

## DISCUSSION

### Jurisdiction and venue

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. Venue is properly within the Western District of Pennsylvania pursuant to 28 U.S.C. § 1391(b).

### Legal standard for summary judgment

A "principal purpose[] of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . and it should be interpreted in a way that allows it to accomplish [that] purpose." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 275 (1986). Fed. R. Civ. P. 56 must therefore "be construed with due regard not only for the rights of persons asserting claims . . . that are adequately based in fact to have [them] tried to a jury, but also for the rights of persons opposing such claims . . . to demonstrate . . . prior to trial, that the claims . . . have no factual basis." *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555, 91 L.Ed.2d at 276. Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). There is no issue of material fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986) (citation omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986), and summary judgment therefore must be

44

entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552, 91 L.Ed.2d. at 273; *see also J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 618 (3d Cir. 1987)(holding that a "plaintiff will be out of court if he has not adduced sufficient evidence to get to a jury on every element of his case").

In order to meet its burden, the party moving for summary judgment need not "produce evidence showing the absence of a genuine issue of material fact"; it can instead meet merely "point[] out . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554, 91 L.Ed.2d at 275.

The burden on the non-moving party is more substantial. Fed. R. Civ. P. 56(e)(2) states it as follows:

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

To meet its burden, the non-moving party may use any type of evidentiary material "listed in Rule 56(c), except the mere pleadings themselves"; this material need not, however, be "in a form that would be admissible at trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553, 91 L.Ed.2d at 274. While the non-moving party need not prove its case, it must show that there is a genuine issue for trial; a "mere scintilla of evidence" or a "metaphysical doubt as to the material facts" is not sufficient. *Anderson*, 477 U.S. at 251, 106 S.Ct. at 2511, 91 S.Ct. at 213; *Matsushita*, 475 U.S. at 586, 106 S.Ct. at1356, 89 L.Ed. 2d at 552.

In deciding a motion for summary judgment, the Court "must view the facts in the light most

45

favorable to the nonmoving party and draw all inferences in that party's favor." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)); *see also Ely v. Hall's Motor Transit Co.*, 590 F.2d 62, 66 (3d Cir. 1978) (quoting *Smith v. Pittsburgh Gage and Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972)) (holding that the reviewing court must "resolv[e] all inferences, doubts and issues of credibility against the moving party") (internal quotation marks omitted). The non-movant must, however, "present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue" for trial. *McCabe v. Ernst & Young*, LLP, 494 F.3d 418, 436-37 (3d Cir. 2006) (quoting *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005)) (internal citations and quotation marks omitted); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695, 716 (1990) (holding that the purpose of Rule 56(e) is "not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit").

A district court may grant summary judgment *sua sponte* so long as the party against which the judgment is to be entered has been provided with "prior notice and an opportunity to oppose summary judgment."[22] *DL Res., Inc.*, 506 F.3d at 22 (citing *Celotex*, 477 U.S. at 326, 106 S.Ct. 2548, 91 L.Ed.2d 265; *Prusky v. Reliastar Life Ins. Co.*, 445 F.3d 695, 699 n.6 (3d Cir. 2006); *Chambers Dev. Co. v. Passaic County Util. Auth.*, 62 F.3d 582, 584 n.5 (3d Cir. 1995)). Fed. R. Civ. P. 56(c) "requires a minimum of ten days notice to the nonmoving party," and the Third Circuit has "insisted on strict compliance" with the Rule. *DL Res.*, 506 F.3d at 223 (citation omitted).

---

[22] Notice is not required where "(1) the point at issue is purely legal; (2) the record was fully developed[;] and (3) the failure to give notice does not prejudice the party." *DL Res.*, 506 F.3d at 224 & n.14 (citing *Gibson v. Mayor & Council of City of Wilmington*, 355 F.3d 215, 219, 224 (3d Cir. 2004)). While the Court believes that the instant case met this standard, it chose to err on the side of caution, especially in light of Plaintiff's *pro se* status, and nonetheless provided Plaintiff with notice. *See* Document No. 77.

46

**Scope of the instant action**

The first issue facing the Court is the actual scope of Plaintiff's action. His complaint in the above-captioned action is solely for retaliation in violation, although Plaintiff never identifies the statute, of 42 U.S.C. § 2000e-3(a). Document No. 1 ¶¶ 7-11. Defendant's motion for summary judgment also addresses only Plaintiff's claim for retaliation. Document No. 53 ¶¶ 1-2.

Plaintiff, however, is acting *pro se*, Document No. 1 p. 2, and as such his complaint is to be construed liberally. *Erickson v. Pardus,* 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081, 1086 (2007) (citations omitted). In the instant complaint, Plaintiff refers to "numerous instances of discriminatory conduct ... based upon [his] race ... and national origin ...." Document No. 1 ¶ 8. He further claims that this discrimination was the reason he filed an earlier EEOC complaint, as well as an earlier complaint with this Court at 3:02-cv- 162, and that those earlier filings led to his allegedly retaliatory dismissal by Defendant. *Id.* at ¶ 9.

In the present case, Plaintiff's filings relating to his own motion for summary judgment and opposing Defendant's motion for summary judgment focus on allegations of discrimination with regard to Plaintiff's compensation and the terms and conditions of his employment, which are violations of 42 U.S.C. § 2000e-2(a) rather than § 2000e-3(a), to the point that the Court had to revisit the complaint to confirm that in fact Plaintiff had only pleaded a retaliation claim. *See* Document Nos. 63-67. Under similar circumstances, at least one court in the Third Circuit has chosen to add the causes of action identified in the plaintiff's summary judgment brief to those included in the complaint.[23] *See Knott-*

---

[23] This holding is in apparent tension with that of *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 499 (3d Cir. 1997), where the plaintiff in an ADA claim had pleaded retaliation and the court had refused to read into the complaint an implicit cause of action for failure to accommodate. *See also id.* at 500 (holding that the ADA's prohibition against retaliation "is similar" to that of Title VII). However, the *Krouse* court was motivated by concerns of prejudice to the defendant from denial of "fair notice." *Id.* at 499. No such concerns are present in the instant case as the Court's decision inures to Defendant's benefit.

*Ellis v. Del. Dept. of Corr.*, Civil Action No. 00-826-SLR, 2001 WL 93561, at \*2, 2001 U.S. Dist. LEXIS 12861, at \*8 (D.Del. Aug. 3, 2001) (amending the complaint *sua sponte* to include additional causes of action identified in plaintiff's motion for summary judgment).

The only limitation on such addition is that all the claims in the action must fall within "the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Id.* (quoting *Hicks v. ABT Assocs., Inc.*, 572 F.2d 960, 966 (3d Cir. 1978)); *see also Anjelino v. N.Y. Times Co.*, 200 F.3d 73, 94 (3d Cir. 1999) (citing *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398-99 (3d Cir. 1976). In the case *sub judice*, the additional claims, which are allegedly all part of an ongoing pattern of discrimination that culminated in Plaintiff's retaliatory dismissal, would have been encompassed by the EEOC investigations resulting from Plaintiff's complaints to that agency and, indeed, the current case could be viewed as a *pro se* litigant's uninformed attempt to amend his original action to incorporate subsequent events as reflected in his second EEOC complaint.[24]

Plaintiff's treatment of his original complaint at 3:02-cv-162 and his filings in the instant matter support this approach. In his original complaint Plaintiff alleged both discrimination and retaliation.[25] Document No. 1, at 3:02-cv-162. During the pendency of the second EEOC investigation Plaintiff moved to discontinue his first complaint, at 3:02-cv-162, averring that the new investigation could provide "the basis for filing an Amended Complaint." Document No. 11 of 3:02-cv-162. Subsequently, in his brief in opposition to Defendant's motion for summary judgment, Plaintiff invited the Court to "reactivate Discrimination Complaint (02-162) in the interest of justice and judicial economy."

---

[24] Plaintiff was represented by counsel in the original action. *See* Docket, 3:02-cv-162.

[25] The Court acknowledges that both 42 U.S.C. §§ 2000e-2 and 2000e-3 refer to discrimination, and that § 2000e-3 does not in fact mention retaliation at all. In the interest of clarity and simplicity, however, the Court finds it desirable to engage in the common practice of referring to § 2000e-2 as the anti-discrimination statute, and § 2000e-3 as the anti-retaliation statute. *See Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 660 (7th Cir. 2005).

48

Document No. 66 p. 3.

Plaintiff's allegations of discrimination are in any event central to the threshold issue in his retaliation claim. For his complaints to have been protected by § 2000e-3(a), Plaintiff must have "h[e]ld an *objectively reasonable belief,* in good faith," that the discriminatory activities of which he complained were unlawful under Title VII. *Moore v. City of Philadelphia,* 461 F.3d 331, 341 (3d Cir. 2006) (citing *Clark County v. Breeden,* 532 U.S. 268, 271, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (*per curiam*)) (emphasis added). *But see Slagle v. County of Clarion,* 435 F.3d 262, 268 (3d Cir. 2006) (quoting § 8-II of the EEOC Compliance Manual) (holding that "a plaintiff is protected under the participation clause 'regardless of whether the allegations in the original charge were valid or reasonable'").[26] The objective reasonableness standard required by *Moore* is not far removed from the standard for summary judgment. *See Anderson,* 477 U.S. at 250-51, 106 S.Ct. at 2511, 91 L.Ed.2d at 213. (holding that summary judgment is precluded "[i]f reasonable minds could differ . . . "). Moreover, "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *Robinson v. Se. Pa. Transp. Auth., Red Arrow,* 982 F.2d 892, 895-96 (quoting *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1484 (3d Cir. 1990)).

The applicable statute of limitations is no bar to the Court's consideration of Plaintiff's

---

[26] The participation clause of 42 U.S.C. § 2000e-3(a) deals with persons who have "made a charge, testified, assisted, or *participated in any manner* in an investigation, proceeding, or hearing under [§§ 2000e through 2000e-17]"). *Slagle,* 435 F.3d at 265-66 (emphasis in original). There is also an "opposition clause" to protect "those who oppose discrimination made unlawful by Title VII." *Moore,* 461 F.3d at 341 (citing *Slagle,* 435 F.3d at 266). Since *Moore* cited *Slagle* for its discussion of both participation and opposition clauses in the sentence preceding its holding that protection under *either* clause requires a reasonable, good faith belief in the underlying claim's validity, the Court assumes that *Moore* overruled *Slagle* on this point. *See id.*

49

numerous complaints. Pennsylvania is a "deferral state,"[27] and Title VII therefore requires that plaintiffs "file a charge with the EEOC 'within 300 days of when the alleged unlawful employment practice occurred.'" *Miller v. Beneficial Mgmt. Corp.*, 977 F.2d 834, 842 (3d Cir. 1992) (quoting *Seredinski v. Clifton Precision Prods. Co.*, 776 F.2d 56, 61 (3d Cir. 1985)). In cases of continuing discrimination, however, the statute of limitations does not begin to run until "the date of the last occurrence . . . ." *Id.* (citing *Bronze Shields, Inc. v. N. J. Dept. of Civ. Serv.*, 667 F.2d 1074, 1081 (3d Cir. 1981)).

Plaintiff has, broadly, alleged ongoing pay discrimination; ongoing retaliation culminating in termination; an ongoing pattern of denial of opportunities for professional development through participation in conferences and presentations; and ongoing failure to promote.[28] The first three categories are obviously within the holdings of *Miller*, as discussed above. Failure to promote imposes an added requirement however; it can only be an ongoing offense if the promotion being sought "could have been granted at any time," or the plaintiff can prove evidence of "systemwide" discrimination. *Id.* at 844 (citing *EEOC v. Hay Assoc.*, 545 F.Supp. 1064, 1082-83 (E.D. Pa. 1982)). In the instant case, it is the Court's understanding that Plaintiff could, theoretically, have been promoted at any time.

Notwithstanding Plaintiff's earlier invitation to the Court to expand the scope of the instant action, he now objects to the Court's intention to decide the claims enumerated above on the existing record. Document No. 78 p. 4. He attempts to use *Waters v. Young*, 100 F.3d 1437, 1442 (9th Cir.

---

[27] A deferral state is one in which there is a "State or local law prohibiting the practice alleged and establishing or authorizing the state or local authority to grant or seek relief" from actions prohibited by Title VII. *Seredinski v. Clifton Precision Prods. Co*, 776 F.2d 56, 61 (3d Cir. 1985)(quoting 42 U.S.C. § 2000e-5(d)).

[28] The Court notes that even if any individual incident in Plaintiff's litany of complaints were time-barred, it could nonetheless be considered in the Court's determination of whether Plaintiff "has raised an inference of . . . discrimination as a part of his prima facie case." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 730 n.5 (3d Cir. 1995).

50

1996) (holding that the trial court has a duty, especially to a *pro se* party, to inform the non-moving subject of a motion pursuant to Fed. R. Civ. P. 50 of the "deficiencies in his proof or to afford him the opportunity to present needed evidence"), to argue that the Court should likewise inform Plaintiff "of the materiality of specific dispositive facts in 'the present record'" pursuant to the Court's *sua sponte* motion to enter summary judgment against Plaintiff. Document No. 78 p. 4. As an initial matter, *Waters* is not binding on this Court. Moreover, Rules 50 and 56 are not identical. A motion for judgment as a matter of law must "specify . . . the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2). A motion for summary judgment, as discussed below, need not. *See* Fed. R. Civ. P. 56. The Court's order, Document No. 77, provided Plaintiff with sufficient notice and opportunity to respond to satisfy the requirements of Fed. R. Civ. P. 56.

Plaintiff has also apparently moved, pursuant to Fed. R. Civ. P. 56(f), for an order for Defendant's production of business records including Executive Management Project Status Reports, as well as "related timesheets, project financial records and billing records . . . [for] all projects involving Plaintiff, and for the whole protected period." Document No. 78 pp. 9-11. He argues that they will show that Plaintiff's performance was not in fact inadequate. *Id.* However, although Plaintiff has included affidavits in his present submission, *see* Document No. 78-4, his attempt to show that production of the enumerated documents is essential to his opposition to summary judgment is not in affidavit form as required by Fed. R. Civ. P. 56(f).

Plaintiff also seems to believe that Defendant has an obligation to "specifically discredit Plaintiff's performance," and that the records he seeks go to that obligation. Document No. 78 p. 11 (emphasis in original). As discussed below, Defendant has no such burden.. Moreover, Defendant's stated reasons for the actions of which Plaintiff complains are almost exclusively related to his

51

behavior. The only case where factors other than Plaintiff's behavior were significant was his 2001 annual evaluation, and even there his behavior was the predominant reason for his low evaluation.

The Court is not convinced that the documents Plaintiff seeks are material to his case. To the extent that they are, they were equally material to his initial claim of retaliatory termination and the period of discovery for that claim has long since closed. The Court will not reopen it now.

### General limits on the scope of Title VII's protections

Before reviewing Plaintiff's claims under Title VII, it is instructive to review what the statute does not do. It "does not mandate a happy workplace." *Moore*, 461 F.3d at 346 (quoting *Jensen v. Potter*, 435 F.3d 444, 451 (3d Cir. 2006)). "It does not require employers to treat all employees fairly, closely monitor their progress and insure them every opportunity for advancement." *Ezold v. Block, Schorr and Solis-Cohen*, 983 F.2d 509, 542 (3d Cir. 1992). It does not transform the Court into a "super-personnel department that reexamines an entity's business decisions." *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 332 (3d Cir. 1995).[29] Indeed, "[n]o matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers," an anti-discrimination law "does not interfere." *Id.* (quoting *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992)); *see also Washington*, 420 F.3d at 660-61 (holding that "the undefined word 'discrimination' does not itself command judges to supervise the minutiae of personnel management," and that sorting out the inevitable grievances of the workplace to determine which occurred because of a party's membership in a protected class would in any event be an impossible task for the courts). Title VII also does not require different, and certainly not preferential treatment,

---

[29] *Brewer* was an Age Discrimination in Employment Act [hereinafter ADEA] case. *Brewer*, 72 F.3d at 330. However, "courts routinely look to law developed under Title VII to guide an inquiry under ADEA," *id.*, and, given the congruence of the policies expressed in *Brewer* and those of the accompanying Title VII cases, the Court sees no reason not to apply its language to the instant case.

because of a protected characteristic. *See Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 (3d Cir. 1999)(holding that a minority plaintiff had no right to a more extensive pre-suspension review than that afforded any other employee).

There is a "commitment" in our society "to free decisionmaking by the private sector in economic affairs." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (citing *Ezold*, 983 F.2d at 531). Title VII does not suspend that freedom just because an employee is a member of a protected class; to the contrary it merely "eliminates certain bases for distinguishing among employees while otherwise preserving employers' freedom of choice." *Gomez v. Allegheny Health Servs., Inc.*, 71 F.3d 1079, 1086 (3d Cir. 1995) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 239, 109 S.Ct. 1775, 1784-85, 104 L.Ed.2d 268 (1989)).

**42 U.S.C. § 2000e-2(a)**

It is unlawful for an employer:

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

The plaintiff in a Title VII action has the initial burden of "establishing a prima facie case" of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677 (1973). Since "[t]he facts necessarily will vary in Title VII cases," the prima facie template is not set in stone. *McDonnell Douglas*, 411 U.S. at 802 n.13, 93 S.Ct. at 1824 n.13, 36

53

L.Ed.2d at 677 n.13. Broadly, it requires that (1) the plaintiff be a member of a protected class or classes; (2) he possess the necessary qualifications to do the thing or things he seeks to do; (3) the employer takes some action contrary to the person's interest, such as failure to hire or promote, or denial of opportunities; and (4) the circumstances surrounding the employer's actions raise a presumption of improper motive. *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352-56 (3d Cir. 1999). At this stage of the review, the plaintiff's qualifications are determined by an objective standard, and subjective qualities "such as leadership or management skill" are left for later in the inquiry. *Sempier v. Johnson & Higgins*, 45 F.3d 724, 729 (3d Cir. 1995) (citing *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990); *Jalil v. Avdel Corp.*, 873 F.2d 701, 707 (3d Cir. 1989)).

Establishment of the prima facie case raises a presumption of unlawful discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407, 416 (1993)(citation omitted). A defendant can overcome that presumption by introducing admissible evidence of non-discriminatory reasons for its actions.[30] *St. Mary's*, 509 U.S. at 507, 113 S.Ct. at 2747, 125 L.Ed.2d at 416 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 & n.8, 101 S.Ct. 1089, 1094-95 & n.8, 67 L.Ed.2d 207 (1981)). The defendant has only the burden of production, however; it need not prove that its stated reasons "*actually* motivated its behavior . . . ." *Fuentes*, 32 F.3d at 763 (emphasis in original) (citing *Burdine*, 450 U.S. at 253-54, 256, 101 S.Ct. at 1093, 1094-95).

If the defendant meets its burden, the plaintiff must then "show by a preponderance of the evidence that the employer's explanation [for its actions] is pretextual (thus meeting the plaintiff's

---

[30] This is in apparent tension with *Celotex*, which holds that the movant in a summary judgment action need not produce evidence, but only has to point out the absence of evidence supporting the non-movant's case. *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554, 91 L.Ed.2d at 275. *St. Mary's* is, however, the more recent case.

54

burden of persuasion)." *Id.* Plaintiff does not have to prove that an "illegitimate" motive was the sole reason for the employer's decision; he need only prove that it was determinative, *i.e.*, "that but for the protected characteristic" the plaintiff would have received the thing he sought. *Fuentes*, 32 F.3d at 764 (citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993)).

To defeat a motion for summary judgment, the "plaintiff must point to some evidence, direct or circumstantial, from which a factfinder *could* reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* (citations omitted) (emphasis in original). Plaintiff need not "adduce evidence directly contradicting the defendant's proffered . . . explanations," but he must present enough evidence to "allow a factfinder reasonably to infer that *each* of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action."[31] *Id.* (emphasis in original) (citations omitted). "[R]ejection of the defendant's proffered reasons" does not, however, compel judgment for the plaintiff, who at all times retains the "ultimate burden of persuasion." *St. Mary's*, 509 U.S. at 511, 113 S.Ct. at 2749, 125 S.Ct. at 419 (citations omitted).

Plaintiff cannot survive summary judgment merely by showing that Defendant was "wrong or mistaken"; whether Defendant was "wise, shrewd, prudent, or competent" is not at issue. *Fuentes*, 32 F.3d at 765 (citing *Ezold*, 983 F.2d at 531, 533; *Villanueva v. Wellesley Coll.*, 930 F.2d 124, 131 (1st Cir. 1991)). Instead, Plaintiff must either (1) "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendant's] proffered legitimate reasons for its

---

[31] If the defendant offers "a bagful" of purportedly legitimate reasons for its actions, however, the plaintiff "may" need to cast doubt on only a "fair number of them," since in so doing it can raise sufficient doubts of defendant's credibility to allow a rational factfinder to "disbelieve" the remainder. *Fuentes*, 32 F.3d at 764 n.7.

55

action that a reasonable factinder could rationally find them unworthy of credence . . . and hence infer that the employer did not act for [the asserted] non-discriminatory reasons" or (2) "come forward with sufficient evidence from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision." *Id.* (internal citations and quotation marks omitted). Proof in the second category includes a showing that the employer had previously discriminated against Plaintiff; that the employer treated similarly situated individuals who were not members of the protected class "more favorably"; or that the "employer [had] discriminated against other members of [the] protected class or other protected categories of persons."[32]

*Id.*

## 42 U.S.C. § 2000e-3(a)

The anti-discrimination provision of Title VII "seeks to prevent injury to individuals based on who they are, *i.e.*, their [protected] status." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 2412, 165 L.Ed.2d 345, 356 (2006). Conversely, "[t]he anti-retaliation provision seeks to prevent harm to individuals based on what they do, *i.e.*, their conduct," *id.*; therefore 42 U.S.C. § 2000e-3(a) makes it unlawful "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [42 U.S.C. § 2000e *et seq.*] or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [42 U.S.C. § 2000e *et seq.*]."

---

[32] The Court notes a certain circularity regarding these proofs. First, a showing of prior discrimination against Plaintiff and possibly members of his or other protected classes would requires a three-step analysis of its own. In addition, a showing of more favorable treatment of at least one person not in the protected class is frequently used to satisfy the fourth element of the prima facie case as, for example, where a qualified member of a protected class is fired and replaced by a member of a favored class. See *Kachmar v. Sungard Data Sys., Inc.*, 109 F.3d 173, 182 (3d Cir. 1997). Nonetheless, the evidence adduced in support of the prima facie case retains its probative value in the third step of the *McDonnell Douglas* analysis; it does not "drop from the case." *Sheridan v. E. I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1069 (3d Cir. 1996) (citing *Burdine*, 450 U.S. at 225 n. 10, 101 S.Ct. at 1095 n.10, 67 L.Ed. 2d 216 n.10).

The prima facie case of retaliation requires a showing that (1) the employee engaged in a protected activity; (2) either contemporaneously with or after the activity, the employer took an action adverse to the employee; and (3) there was a "causal link between the adverse action and the protected activity." *Andreoli v. Gates*, 482 F.3d 641, 649 (3d Cir. 2007)(citing *Weston v. Pennsylvania*, 251 F.3d 420, 430 (3d Cir. 2001)). Filing a complaint with the EEOC or with the court is obviously a protected activity; so is an "informal" protest and a complaint to management. *See Moore*, 461 F.3d at 343; *Weston*, 251 F.3d at 430. For the protection to adhere Plaintiff, although he "need not prove the merits of the underlying . . . complaint" must show that "a reasonable person in [his] circumstances would have concluded that the employer was engaging in discriminatory conduct" in the complained-of action. *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 n.9 (3d Cir. 2007) (citing *Moore*, 461 F.3d at 344). Plaintiff's complaint must also allege discrimination "on the basis of race, color, sex, religion, or national origin"; a "general complaint of unfair treatment" is "facially invalid" and therefore not sufficient to invoke the protections of § 2000e-3(a). *Slagle*, 435 F.3d at 265-67.

Termination is the quintessential adverse employment action. However, to satisfy the second prong of the prima facie case for retaliation, the plaintiff need only show that the employer's action was "materially adverse" in that it "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. 53, 126 S.Ct. at 2415, 165 L.Ed.2d at 355. Because there must be some substantiality to the alleged adverse action, nothing in the anti-retaliation statute imposes "a general civility code for the American workplace," nor does an employee's complaint of discriminatory activity "immunize [him] from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.*

For the third prong of the prima facie case of retaliation, Plaintiff must show that the adverse

57

action was motivated by "retaliatory animus," *Farrell*, 206 F.3d at 281, 284, and that this animus had a "determinative effect" on the complained-of decision. *Woodson v. Scott Paper Co.*, 109 F.3d 913, 935 (3d Cir. 1997). The Court must consider "a broad array of evidence" in making its determination. *Farrell*, 206 F.3d at 281, 284 (citation omitted). As an initial matter, however, Plaintiff must show that the party or parties who took the adverse actions were aware of Plaintiff's protected activities. *Andreoli*, 482 F.3d at 650; *Weston*, 251 F.3d at 433 (citing *Jones v. School Dist. of Phila.*, 198 F.3d 403, 415 (3d Cir. 1999)). Provided that they were, the "unusually suggestive" temporal proximity of the employer's and employee's actions can by itself establish the necessary causal link. *See LeBoon*, 503 F.3d at 232 (citing *Clark County*, 532 U.S. at 273-74, 121 S.Ct. 1508, 149 L.Ed.2d 509; *Jalil*, 873 F.2d at 708). A gap of two days has been held to be unusually suggestive; a gap of three months is not. *Id.* at 232-33 (citations omitted). Lack of temporal proximity is not fatal, however, and the passage of "almost two years" or indeed any period of time, is "not legally conclusive proof against retaliation." *Robinson*, 982 F.2d at 894-95.

"Intervening antagonism" is another factor that is commonly used to show retaliatory animus. *See LeBoon*, 503 F.3d at 232-33. However, that antagonism must have arisen at the time of or after the protected activity. *Id.* at 233-34; *see also Robinson*, 982 F.2d at 895 (finding that the employer subjected Robinson to a "constant barrage" of abusive behavior, "all of which occurred soon after plaintiff's initial complaints and continued until his discharge"). If Plaintiff cannot show that the relationship in question became "qualitatively different" after the protected activity, he cannot meet his burden with this factor. *LeBoon*, 503 F.3d at 233.

Plaintiff can also attempt to show "inconsistencies" in Defendant's stated reasons for his firing. *Id.* at 232-33. Retaliation claims are also subject to the *McDonnell Douglas* burden shifting regime

whereby, if plaintiff manages to establish his prima facie case of retaliation, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct and, if it does so, the plaintiff must be able to convince the factfinder both that the proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Moore*, 461 F.3d at 342 (quoting *Krouse*, 126 F.3d at 500-01)). Proof of inconsistencies might be used either to establish the prima facie case or to demonstrate pretext in the third step of *McDonnell Douglas*, but there is nothing in *McDonnell Douglas* that "compartmentalize[s] the evidence so as to limits [sic] its use [to] only one phase of the case." *Farrell*, 206 F.3d at 286 (citing and quoting *Jalil*, 873 F.2d at 709 n.6).

## ANALYSIS

### 1. Discrimination

As the legitimate, non-discriminatory reasons for Defendant's actions all revolve around Plaintiff's alleged lack of interpersonal skills, the Court will consider the first two parts of the *McDonnell Douglas* burden-shifting test separately for each count discussed below and then conduct a single pretext analysis for the counts that proceed to the third step of *McDonnell Douglas*.

#### a. Failure to promote

Plaintiff cannot make out a prima facie case on his ongoing failure to promote claim. It is undisputed that Defendant is of Indian origin, and that he is therefore a member of a protected class based on his race and national origin. It is also undisputed that he was not promoted after 1994. However, although Plaintiff claims to have met the objective qualifications for promotion, the criteria for his next promotion are set forth in Ex. 24 p. 38; Plaintiff by his own admission could not satisfy them; therefore he also cannot satisfy the second prong of his prima facie case. *Id.* at 8.

If the Court were nonetheless to find that Plaintiff's admittedly impressive resumé, Ex. 68 pp.

59

9-16 was somehow sufficient to qualify him for promotion, Plaintiff has not provided any evidence that would support a conclusion of impermissible motive. Instead he has argued, in effect, that since he was qualified – which according to Defendant he was not – and was not promoted, the failure to promote proves the existence of the discrimination. Such is not the case. Plaintiff must at minimum make a showing that there was either the possibility of someone being promoted to the position he sought and the position remained open, or that another person was promoted to the position under circumstances that would support an inference of an impermissible discriminatory motive. *See Pivirotto*, 191 F.3d at 356-57; *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 698 (3d Cir. 1995). He has done neither.

Even if the Court were to find that Plaintiff had made out his prima facie case for failure to promote, Defendant's record evidence states repeatedly that Plaintiff lacked the "requisite leadership, [and] particularly the people skills" for the promotions he sought. *See* Ex. 49 pp. 3, 5; Ex. 55. Although subjective, these are legitimate, non-discriminatory bases for a hiring or promotion decision, and may be properly raised at the second stage of the burden shifting analysis. *See Fuentes*, 32 F.3d at 765-66; *Healy v. N. Y. Life Ins. Co.*, 860 F.2d 1209, 1220 (3d Cir. 1988); *Sempier*, 45 F.3d at 729 (citing *Weldon*, 896 F.2d at 798)).

### b. Pay discrimination

Here Plaintiff's prima facie case fares somewhat better, but is still not successful. From the beginning of 2001 through the end of his employment he was paid at the rate of $79,500 per year where, according to Defendant, $89,000 per year was the midpoint or "market" amount, $71,000 per year was the minimum amount, and $83,000 per year was the bottom one third amount. This at least suggests the possibility of an impermissible practice, but although Plaintiff has claimed that "similarly situated Caucasian engineers with less experience and education than Plaintiff [received] higher relative

60

compensation . . . and higher percentage merit increases," Plaintiff has offered no evidence to support his assertion.[33] *See* Document No. 1 at 3:02-cv-162 ¶ 10.

If the Court were nonetheless to conclude that Plaintiff had made out his prima facie case, Defendant has stated that its compensation system is "merit based"; that the employee's performance reviews determine the size of the merit raises; and that Plaintiff was receiving "close to the maximum eligible raises based on [his] performance." Document No. 32 p.5; Jones Aff. Defendant has also stated that the performance reviews encompass more than "technical accomplishments"; that they include "factors such as leadership, teamwork, attitude, ability to take criticism, agility, and support of one's co-workers" as well; and that these non-technical factors had "likely caused [Plaintiff's] overall evaluations to be lower than they otherwise [might] have been." Document No. 32 p.5; Jones Aff.

Moreover, to the extent that a below-market salary could be construed to be discriminatory, it was Plaintiff's choice not to be compensated at the market rate. Kathy Jones offered to raise Plaintiff's salary to the market rate, a raise of $9,500 or approximately 12 percent, at the meeting of Jones, Plaintiff, and Jay Bleehash on January 4, 2001. Depo. p. 63; Ex. 20 p. 2; Ex. 32 p.2; Jones Aff.; Bleehash Aff. Plaintiff, however, refused the offer, stating that he belonged in the top one third of his salary category.

### c. Denial of opportunities

Plaintiff can, finally, make out a prima facie case on this claim, at least for specific instances. It is clear from the record that interaction with persons outside of CTC was essential to professional development within the company. *See* Ex. 24 pp. 8, 38. It is equally clear that Defendant was reluctant to allow Plaintiff to represent it to either colleagues or clients. At least on certain occasions, Defendant

---

[33] Defendant also denies the allegation. Document No. 4 at 3:02-cv-162 ¶ 12.; Ex. 18; Bleehash Aff.

gave opportunities to present materials for which Plaintiff was objectively qualified to others who, apparently, were Caucasian. *See* Ex. 2; Ex. 32 pp. 3-4. That is enough to make out the elements of Plaintiff's prima facie case and raise an inference of impermissible discrimination. Once again, however, Defendant explained that Plaintiff's personality, namely his "inability to take criticism and overly argumentative nature" did not make him "an ideal candidate to send to conferences." Ex. 32 p. 4.

### d. Miscellaneous claims of discrimination

Plaintiff complained that he was discriminatorily denied tuition assistance as a full time student at Cornell. Defendant's policy, though, was to grant such assistance only to full time employees, and the only CTC employee mentioned in the record who undisputedly was not full time and was nonetheless offered tuition assistance was a member of Plaintiff's protected class. As this raises no inference of discrimination, Plaintiff cannot establish his prima facie case.

Plaintiff argues that this confluence of ethnicities is irrelevant, since Plaintiff's next promotion, unlike that of the other employee/student of Indian heritage, would have made him part of Defendant's Leadership Team, and Defendant's real motive in denying Plaintiff tuition assistance was to prevent such a promotion of a non-Caucasian. *See* Ex. 39 p.12. However, as discussed in the *McDonnell Douglas* step three analysis, *infra*, the record indicates that by the time Plaintiff left for Cornell in the spring of 1998 it would have taken considerably more than an MBA to render Plaintiff eligible for promotion in Defendant's eyes. Indeed, the alacrity with which Plaintiff's request for a year-long leave of absence was granted – he applied on May 1, 1998 and was approved on May 19, 1998 – as well as the lukewarm terms of the leave, which contained no promise of continued employment upon its completion, could suggest to a rational factfinder that Defendant hoped that Plaintiff would get his

62

degree and seek employment elsewhere. *See* Ex. 12.

Plaintiff argues that the requirement that he assign patent rights to Defendant was discriminatory and, indeed, a form of slavery. Ex. 29-31. As such assignment was a company-wide policy that was clearly set forth as part of the terms and conditions of employment, to make out his prima facie case Plaintiff would have to demonstrate that CTC employees outside of his protected class were not required to assign their intellectual property rights. He has never even suggested as much.

The record is replete with Plaintiff's use of the term "*quid pro quo*" in describing Defendant's alleged discrimination against him. He clearly understands that the term translates as "something for something." Black's Law Dictionary 1282 (8th ed. 2004). Equally clearly, he does not understand its meaning as a term of art in Title VII cases. The term does not appear anywhere in the statute itself. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752, 118 S.Ct. 2257, 2264, 141 L.Ed.2d 633, 647 (1998). It is nonetheless used to describe a situation where "an employee's response to unwanted [sexual] advances was subsequently used as a basis for a decision about compensation, [terms, conditions, or privileges of employment]." *Farrell*, 206 F.3d at 281-82 (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1296 (3d Cir. 1997)). Under those circumstances, sexual harassment in violation of Title VII is assumed. *Ellerth*, 524 U.S. at 752, 118 S.Ct. at 2264, 141 L.Ed.2d at 647; *Farrell*, 206 F.3d at 281-82. There is no suggestion in the record of Title VII *quid pro quo*; within the general meaning of the term Plaintiff's claims are properly analyzed as either discrimination or retaliation.

Plaintiff claims that a highly critical subsidiary review that was prepared by R. J. Henry, Ex. 15, prior to Plaintiff's 2000 annual evaluation was discriminatory. Document No. 78 pp. 11-17. Henry was then the program manager of the most important program at CTC and his opinion was "very

63

important." Depo. p. 51. Plaintiff claims his original 2000 annual evaluation was retracted, based at least in part on his objections to criticisms derived from Henry's evaluation. Plaintiff also admits, however, that he had not seen the Henry evaluation before his deposition in July of 2006. Depo. p. 48.

Plaintiff claims that Henry's evaluation, which included his stated refusal to use Plaintiff as a program manager on future projects "poisoned the well" for Plaintiff at CTC, and that the "adverse impact [from this evaluation] flowed all the way through the rest of Plaintiff's career at *CTC*." Document No. 78 pp. 14-15 (emphasis omitted). However, Plaintiff has never provided any evidence to support this assertion. The Court also finds it notable that Henry's alleged well-poisoning statements were made the same year that Plaintiff received the evaluation that he cites as favorable. *See* Document No. 78 p. 3. Although Plaintiff now appears to assert that Henry actually prevented Plaintiff from acting as a program manager, *see id.* at 15,[34] he has likewise failed to provide sufficient information about CTC's organizational structure to allow the Court to understand Henry's reach within the company. Plaintiff has not shown either that Henry could have prevented Plaintiff from being a program manager outside of the NCEMT project, or that it was necessary for Plaintiff to be a program manger to maintain the necessary level of billable hours. Regarding the latter point, so far as the Court can determine Plaintiff was program manager only once, for a period of a few months, yet he claims that he had never, prior to September of 2000, had any problem maintaining full tasking. It is therefore unclear to the Court how Plaintiff can now claim that his full tasking was predicated on his status as program manager. *See id.*

---

[34] It is impossible for the Court to determine whether Plaintiff has alleged in Document No. 78 that Henry removed him as program manager. However, in Plaintiff's Verification, Document No. 78-3 pp. 2-3, Plaintiff states that he "took over" the project "towards the end . . . [and] served as the CTC Project manager for about three (3) months and closed out the project . . . ." This indicates to the Court that Henry did not in fact remove Plaintiff, but rather that Plaintiff's position as program manager merely expired with the project.

64

Plaintiff has failed to make out a prima facie case of discrimination regarding the Henry evaluation. Even had he done so, Henry's primary criticism of Plaintiff was his behavior, Defendant's stated non-discriminatory reason for all the actions of which Plaintiff complains.

### e. *McDonnell Douglas* step three

To prevail in the third step of the *McDonnell Douglas* analysis, Plaintiff must either (1) discredit Defendant's explanations for its actions or (2) produce sufficient evidence that the finder of fact would conclude, Defendant's rationale notwithstanding, that "but for" Plaintiff's membership in a protected class Defendant would not have treated Plaintiff in the fashion of which he complains. *Fuentes*, 32 F.3d at 764-65. The Court will take up part (2) first. As discussed above, the proofs for part (2) consider prior discrimination against Plaintiff; more favorable treatment of persons not within Plaintiff's protected class; or discrimination by Defendant against other persons who are members of any protected class. Since the Court has treated Plaintiff's discrimination complaints as ongoing, there are no prior acts of discrimination to consider.

Plaintiff has not offered any evidence of discrimination against members of any protected class including, except for his purported proofs of discrimination against himself, Plaintiff's own.[35] The

---

[35] In his March 24, 2008 filing, Plaintiff did claim that R. J. Henry engaged in "ethnic cleansing" in the manner of "Slobodan Milosevic, a notorious war criminal." Document No. 78 p. 14 n.3. He then cited two instances in which he claimed that Henry had removed non-Caucasian program managers and replaced them with Caucasians. *Id.* As an initial matter, although Plaintiff furnished several affidavits in his latest filing, the ethnic cleansing averment is only contained in his unsworn Opposition to Court's Order Regarding Summary Judgment, and he has offered nothing further in support. Document No. 78 p. 14 n.3. Pursuant to Fed. R. Civ. P. 56(e)(2), mere allegations, without more, do not satisfy Plaintiff's obligation to respond to a motion for summary judgment.

In addition, one of the alleged replacements, Daniel Winterscheidt, was program manager of the Titanium Single-Melt project at the time of Plaintiff's dismissal. Since Plaintiff's complaint in the instant case was for retaliatory termination, and since Plaintiff had the initial burden to show that he had "h[e]ld an *objectively reasonable belief*, in good faith," that the discriminatory activities of which he had complained were unlawful under Title VII, *Moore* 461 F.3d at 341 (emphasis added), the Winterscheidt information was as relevant to the initial retaliation case as it is to the present expanded case. Plaintiff did not include this information in the record for that case, which is long-closed, and should not be allowed to add it now.

Plaintiff has, more generally, argued throughout this case that the behavior in which he engaged while employed by Defendant would have been viewed as acceptable if it had come from a Caucasian employee. He offers no evidence,

65

record suggests that people of many different ethnicities were employed by Defendant in positions roughly similar to Plaintiff's, yet Plaintiff has not offered a single affidavit from a present or former employee charging any act of discrimination against a member of any protected class. *See* Ex. 74 (listing the following additional proposed authors of a paper, where Plaintiff was to be lead author: Chengming Wang, Troy Tack, Ibo Ucok, and Mehmet Gungor); Ex. 81 (listing the following program managers as persons who might provide work for Plaintiff: Kathy Carr, Tom Creeden, James Fisher, Mehmet Gungor, Ilbrahim [sic] Ucok, Glen Nickodemus; Edward Fasiska, Robert Dax, Timothy Friedhoff, Suhas Vaze, Urban DeSouza, Larry Knipple, Georgette Kotsagrelos and Mustafa Gudu). There is also nothing in the record to indicate that an "atmosphere of racial prejudice infect[ed] the workplace." *Cf. Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 641 (3d Cir. 1993)(holding that "one could infer [an atmosphere of prejudice] from employees' remarks and the racially derogatory notes Josey received," thus supporting a finding of pretext). To the extent that some people simply did not get along with Plaintiff, or vice versa, even "an unfortunate and destructive conflict of personalities does not establish . . . discrimination." *Ezold*, 983 F.2d at 544 (quoting *Bellissimo v. Westinghouse Elec. Corp.*, 764 F.2d 175, 182 (3d Cir. 1985); *Hankins v. Temple Univ.*, 829 F.2d 437, 443 (3d Cir. 1987) (citing *Bellissimo*, 764 F.2d at 182).

The only persons Plaintiff identifies as being outside of his protected class and receiving more favorable treatment than he are the people who were chosen to make presentations in his stead. As explained in n. 31, *supra*, the Court is reluctant to engage in the circular reasoning necessary to use an element of the prima facie case for denial of opportunity to overcome Defendant's stated reason for

however, and the Court cannot, after reviewing the record of Plaintiff's communications with his superiors, imagine any organization that would have tolerated such behavior from anyone, at least for any length of time.

66

such denial, where Defendant's stated reason has first been used to overcome the presumption raised by the prima facie case in which the favorable treatment was an element.

The Court is especially reluctant to engage in the reasoning described above in the instant case, since Plaintiff has asserted, albeit without proof, that the real reason he was not allowed to attend meetings was "due to his inability to speak the English language as fluently as native born Caucasian employees," and that exclusion for this reason was impermissibly discriminatory. Ex. 3 ¶ 9. Even if Plaintiff is correct that he was excluded because of his language skills, however, "[a]n employment decision based on foreign accent does not violate Title VII if an individual's accent materially interferes with the ability to perform job duties." EEOC Compliance Manual § 13-V, *available at* http://www.eeoc.gov/policy/docs/national-origin.html#V (last visited March 19, 2008); *see also Shieh v. Lyng*, 710 F.Supp. 1024, 1031-33 (E.D. Pa. 1989) (citations omitted); *Hou v. Com. of Pa.*, 573 F.Supp. 1539, 1546-47 (W.D. Pa. 1983). Defendant has stated that "the company has the responsibility to present *CTC*'s work in the most positive way," and that "[m]anagers must send the person best suited to turn *CTC*'s technical developments into business for the company . . . ." Ex. 32 p. 4. Based on Plaintiff's idiosyncratic approach to the English language as demonstrated in his written submissions; Plaintiff's admission that he writes English more fluently than he speaks it, Ex. 45 p.6; Depo. p. 52, and the transcript of Plaintiff's deposition, the Court finds that a factfinder could not reasonably fail to conclude that Plaintiff's verbal skills afforded Defendant legitimate ground to assign presentations to other, more fluent employees.

To discredit Defendant's proffered legitimate reason for its actions, Plaintiff must "demonstrate . . . weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions . . . ." *Fuentes*, 32 F.3d at 765. Plaintiff cannot show inconsistencies or contradictions; Defendant has been adamant

67

throughout that virtually all of Plaintiff's difficulties at CTC were due to his behavior and lack of interpersonal skills. This is clearly not a *post hoc* rationalization. To the contrary, Defendant has furnished ample documentary evidence dating back to Plaintiff's 1995 annual performance review showing that Defendant never found Plaintiff's behavior acceptable; that in fact his behavior was a significant matter which Defendant never overlooked; and that Defendant clearly explained to Plaintiff that his behavior was damaging his career at CTC. *Cf. Brewer*, 72 F.3d 332-33 (citing *Levin v. Analysis & Tech., Inc.*, 960 F.2d 314, 317 (2d Cir. 1992) (holding that "poor attitude" could not support summary judgment for defendant where plaintiff's "irascible nature had for many years been accepted by his coworkers and superiors"); *Giacoletto v. Amax Zinc Co.*, 954 F.2d 424, 426-27 (7th Cir. 1992) (upholding a finding of pretext despite defendant's claim of "poor interpersonal skills" where plaintiff "had been kept on as a supervisor for 14 years despite his abrasive personality and because of his ability to produce")) (holding that a belated reliance on problems that had been "overlooked or tolerated" for twenty years as justification for an employment action "tends to show pretext").

Plaintiff does, however, attempt to demonstrate weaknesses and implausibilities. As an initial matter, he cites *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) for the proposition that his "perceived 'lack of personality traits'" based on "unsubstantiated perceptions" was a "forbidden factor" in any assessment of Plaintiff by Defendant. Document No. 64 pp. 2-3; Document No. 67 p. 2 ¶ 3; Document No. 78 pp. 5-8. Plaintiff misunderstands the case. Its holding, which addressed burdens in mixed motive discrimination cases, which the case *sub judice* is not,[36] was overturned by statute. *See Stender v. Lucky Stores, Inc.*, 780 F.Supp. 1302, 1305-06 & n.9

---

[36] A mixed motive case is one in which the plaintiff shows that the adverse decision was the "'result of multiple factors, at least one of which is illegitimate,'" and the illegitimate factor played 'a motivating part' in the adverse decision." *Watson v. SEPTA*, 207 F.3d 207, 215 (3d Cir. 2000)(quoting *Price Waterhouse*, 490 U.S. at 244-45, 260, 109 S.Ct. 1775 (plurality opinion)). The distinction between "pretext" and "mixed-motive" cases is established by the way they are

(N.D. Cal. 1992). In addition, only a four-Justice plurality discussed personality issues; there was no majority holding on the matter. *See Price Waterhouse*, 490 U.S. at 234-37, 257-58, 109 S.Ct. at 1782-83, 1794-95, 104 L.Ed.2d at 277-80. 292-93. Finally, the plurality specifically rejected any requirement that an employer demonstrate that its perceptions of an employee be "based on reality"; it only required, for any set of perceived character traits, that a negative reaction to those traits – in that case high levels of brusqueness and aggression – not be due to the employee's membership in a protected class.[37] *Price Waterhouse*, 490 U.S. at 257-58, 109 S.Ct. 1794-95, 104 L.Ed.2d at 292-93.

Throughout the record of this case, Plaintiff decries Defendant's use of "perceptions" in his evaluations. Document No. 64 pp. 2, 3, 6, 12, 13, 20, 21; Ex. 24. He also argues, *inter alia*, that to prevail in this action Defendant "must persuade the Court" that its standards for employee evaluation are "soundly based" on empirical data.[38] Document No. 64 p. 6. He also appears to argue that "the various supervisors, and others who participated in Plaintiff's performance appraisals [should] have

---

presented. *Id*. at 214-15 & n.5. In the case at bar, since Plaintiff claims that Defendant's actions were motivated *solely* by impermissible factors and Defendant claims that its actions were motivated *solely* by permissible factors there is no issue of mixed motivation and the Court need not examine the matter further. *See id.* at 214-20.

[37] That Ms. Hopkins's behavior was viewed through the lens of her gender was abundantly apparent from some of the comments cited by the plurality. A partner "described her as 'macho'"; another said that she "overcompensated for being a woman," a third "advised her to 'take a course at charm school'"; and yet another advised her to "walk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." *Price Waterhouse*, 490 U.S. at 235, 109 S.Ct. at 1782, 104 L.Ed.2d at 278. Indeed, one partner had stated "in previous years" that "he could not consider any woman seriously as a partnership candidate and believed that women were not even capable of functioning as senior managers . . . ." *Price Waterhouse*, 490 U.S. at 236, 109 S.Ct. at 1783, 104 L.Ed.2d at 279.

Conversely, there is only one comment in the record that directly refers to Plaintiff's ethnicity or national origin. *See* Depo. p. 137 (Plaintiff claiming to be told by Defendant that "all the Indians [were] doing" cost analysis). There is nothing in the record, however, to indicate that Defendant viewed the performance of cost analysis as some sort of racially-determined requirement. Moreover, Plaintiff, who perceived discrimination in many if not most of his interactions with Defendant has given no indication that he viewed this statement as suggesting that because of his national origin he should perform cost analysis. Indeed, he has never mentioned it again, at least in the record. The Court therefore finds that this at best raises the sort of metaphysical doubt that cannot defeat summary judgment, *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356, 89 L.Ed. 2d at 552, and shall not consider it further.

[38] In so doing he fails to recognize that the burden of persuasion in this case never shifts; it remains with Plaintiff throughout.

69

been certified by [a] State, Federal, or reputable independent agency to 'be fair, honest and impartial' in evaluating the performance of highly qualified, non-Caucasian employees." *Id.* at 13; *see also* Document No. 65-3 p. 27 (cover page for an Exempt Performance Appraisal, admonishing the reviewer to be "fair, honest and impartial"). Finally, he argues that Defendant's evaluations of his personality traits are simply wrong.

Defendant employs two evaluation forms. The Exempt Performance Feedback form, which is used to collect information from colleagues and co-workers contained, at least from 1996 on, categories asking for ratings on "existing technical knowledge"; "continuous learning and improvement"; "leadership/initiative"; ability to communicate verbally"; "ability to communicate in writing"; "attitude/enthusiasm"; and "agility." *See* Ex. 45. It also asked the evaluator to discuss the employee's strengths and weaknesses. *Id.* These forms were then used by the employee's line manager to generate the Exempt Performance Appraisal that provided a substantial if not the sole basis for the employee's compensation and promotion. In this form the line manager had to describe the employee's strengths, weaknesses, and "significant personal characteristics." Ex. 49.

The Court is aware of no requirement, nor does Plaintiff cite to any, that persons evaluating even highly qualified non-Caucasians must have some sort of certification before they may do so. Characteristics such as those addressed in Defendant's forms are legitimate, non-discriminatory points for evaluation. *See Fuentes*, 32 F.3d at 765-66; *Healy*, 860 F.2d at 1220. Plaintiff can cite to no authority that commands that employee evaluations be based on empirically-derived criteria and, indeed, to impose such a requirement would be to bury both businesses and the courts under an impossible load. At most, all Title VII requires is that an employer's criteria not impose unfavorable

70

treatment on members of a protected class.[39] There is nothing on the face of Defendant's criteria to suggest they did, and Plaintiff has offered no evidence to the contrary.

To address Plaintiff's objection to Defendant's use of perceptions in its employee evaluations requires a brief detour into epistemology. "Perception" is defined in pertinent part as: "1. The act, process, or faculty of perceiving. 2. The effect or product of perceiving. 3. a. Insight, intuition, or knowledge gained by perceiving. . . . " Webster's II New College Dictionary 816 (2001)[hereinafter Webster's]. "Perceive" in turn is defined as: "1. To become aware of directly through the senses, esp. to see or hear. 2. To take notice of: OBSERVE. 3. To achieve understanding of." *Id.* at 815. In light of these definitions, the Court can see no way in which any evaluator could address Defendant's criteria or, indeed, any standards of measurement *without* resorting to perception. Since the criteria are valid and may only be satisfied via perceptions, the Court is content to conclude that the use of perceptions in evaluations is valid as well.[40]

Plaintiff's argument that his evaluators should have received special training in the evaluation of minority employees is not persuasive. Title VII requires that members of a protected class not be treated differently than those outside the class; it does not require that they be afforded different standards of review because of their protected status. *See Pamintuan*, 192 F.3d at 387. Plaintiff's argument that his behavior was not problematic is unavailing; he "cannot survive summary judgment

---

[39] Disparate impacts are in fact permitted so long as they are "job related for the position in question and consistent with business necessity" and the disputed practice is not being used, as Plaintiff has alleged in the instant case, for purposes of intentional discrimination. 42 U.S.C. § 2000e-2(k).

[40] It is almost too obvious to mention that when it comes to employee evaluations, the employee's "view of his performance is not at issue; what matters is the perception of the decisionmaker." *Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir. 1991), overruled in part on other grounds by *St. Mary's*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407; *see also Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980). As a result, "[t]he fact that an employee disagrees with an employer's evaluation . . . does not prove pretext." *Billett*, 940 F.2d at 825 (citing *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990)).

71

simply by alleging that [Defendant's decisions were] 'wrong or mistaken.'" *Id.* (citing and quoting *Fuentes*, 32 F.3d at 765). Moreover, no rational factfinder could, on the record of this case, find that Plaintiff's behavior was *not* problematic.

At base, Plaintiff's burden in this case has been to show either that he "satisfied the criteri[a] that the decisionmakers disapproving of him relied upon (e.g., by showing that others no more qualified than he under [those] criteri[a] were not treated adversely), or that the decisionmakers did not actually rely upon [those] criteri[a]." *Fuentes*, 32 F.3d at 767. He has done neither, and so cannot survive summary judgment on his discrimination claims. *See id.*

## 2. Retaliation

The Court could not possibly overstate how difficult it has been to understand Plaintiff's submissions and treat them with a coherence which they themselves do not possess. The Court is still not certain what Plaintiff thinks Title VII protects. Sometimes he treats it as a general doctrine which mandates a workplace that is completely fair for all.[41] At other times he implies that it guarantees a workplace that is completely fair to him in every aspect because of his membership in a protected class. At still other times he seems to believe that once he had engaged in a protected activity under Title VII he was immune from the normal behavioral and performance requirements of the workplace. *See* Depo. p. 153 (stating that "[a]nything that happened after January 2001 is basically retaliation"). As discussed above, to the extent he actually does believe these things he is wrong on all counts.

Pursuant to its *sua sponte* expansion of the instant action to encompass all of Plaintiff's

---

[41] Although the Court hesitates to make too much of it, the Dilbert comic strip included as part of Plaintiff's response to his 2001 annual review, Ex. 36 p.6, which decries office politics in general and makes no mention of race whatsoever, is illustrative. Even more to the point, Plaintiff wrote, erroneously, to an EEOC investigator that Defendant was "required by the EEO Act, to offer its employees the maximum opportunity to achieve challenging and fulfilling assignments and professional growth, commensurate with the employee's education, interests, demonstrated capabilities and willingness to take on added responsibility . . . ." Ex. 39 p.12.

potentially cognizable claims, the Court has identified the following alleged instances of retaliation:[42]

a. Plaintiff's annual performance evaluation of 1995 and related actions by his Line Manager.

b. Insubordination memo issued to Plaintiff on September 19, 2001 for failure to assign patent rights as required by CTC policy.

c. Plaintiff's annual performance review of 2001 and the accompanying position description.

d. Plaintiff's out-of-cycle performance review dated May 1, 2002 and the accompanying position description.

e. Individual evaluations prepared as part of Plaintiff's 2002 annual performance review.

f. Plaintiff's 2002 annual performance review and the accompanying position description.

g. The meeting and memorandum placing Plaintiff on probation.

h. Plaintiff's termination.

The Court has had more difficulty identifying Plaintiff's protected activities. As discussed above, even informal protests are protected. The Third Circuit has not, however, addressed whether a hostile or offensive message, even if it purports to object to illegal discrimination, can ever be sufficiently obnoxious to remove itself from the protections of Title VII. *See Campbell v. Abercrombie & Fitch Co.*, No. Civ.A. 03-3159, 2005 WL 1387645, at *6, 2005 U.S. Dist. LEXIS 11507, at *16 (D.N.J. June 9, 2005). Other circuits have. *See Robbins v. Jefferson County Sch. Dist. R-1*, 186 F.3d 1253, 1259-60 (10th Cir. 1999), abrogated on other grounds by *Nat'l R.R. Passenger Corp., v. Morgan*,

---

[42] Plaintiff has also alleged "post-employment retaliation," Document No. 64 p. 23; Document No. 78 pp. 20-23, referring to issues surrounding U.S. Patent 5,744,782 that emerged after his termination. As the Court has already addressed that matter in a separate opinion, Document No. 29, it will not revisit the issue here.

73

536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (holding that issuing a "barrage of inflammatory memoranda" containing "voluminous and sometimes specious complaints," and "engag[ing] in antagonistic behavior toward . . . superiors" is not reasonable and therefore "[does] not constitute protected opposition" to discriminatory practices); *Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 401 (11th Cir. 1989)(holding that the conduct of a woman who had "earned the reputation as a disruptive complainer who antagonized her supervisors and colleagues and impaired the morale of her unit" could be "held to fall outside the protection" of Title VII, "even when associated with complaints of discrimination"); *Hochstadt v. Worchester Found. for Experimental Biology*, 545 F.2d 222, 230, 234 (1st Cir. 1976) (holding that an employee's conduct may be "so inimical to her employer's interest, and so 'excessive', as to be beyond the protection of [Title VII] even though her actions were generally associated with her complaints of illegal employer conduct").

Other circuits, while not specifically addressing the issue of offensive memoranda and deportment, have nonetheless held that Title VII protections are not absolute, but rather that an employee's conduct in opposition to an illegal employment practice may "so interfere[] with the performance of his job that it renders him ineffective" and therefore places that conduct outside the protections of Title VII. *Jones v. Flagship Intern.*, 793 F.2d 714, 728 (5th Cir. 1986) (citing and quoting *Rossser v. Laborers' Int'l Union, Local 438*, 616 F.2d 221, 223 (5th Cir. 1980)); *see also Matima v. Celli*, 228 F.3d 68, 79 (2d Cir. 2000) (holding that even when the employee's behavior is in opposition to a forbidden employment practice, "[a]n employer does not violate Title VII when it takes adverse employment action . . . to preserve a workplace environment that is governed by rules, subject to a chain of command, free of commotion, and conducive to the work of the enterprise"); *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 763-64 (9th Cir. 1996) (citations omitted) (holding

74

that "[a]n employee's opposition activity is protected only if it is reasonable in view of the employer's interest in maintaining a harmonious and efficient operation"); *Pendleton v. Rumsfeld*, 628 F.2d 102, 108 (D.C. Cir. 1980) (quoting *Hochstadt*, 545 F.2d at 231)(holding that the "requirements of the job and the tolerable limits of conduct in the particular setting" must be used to determine the "limits of the protected activity").

The Court finds it perfectly appropriate to limit the protections of Title VII to employee behavior that is reasonable, as determined by balancing the interests of the employee in opposing unlawful discrimination with those of the employer in maintaining a productive workplace. Under such a standard, many of Plaintiff's responses to Defendant are clearly unreasonable and hence unprotected. The Court takes special note of the memo in which Plaintiff accused Defendant of perpetuating slavery with its IP policy, Ex. 31 p.2, his response to his 2001 evaluation, where he accused Defendant of practicing "corporate terrorism," Ex. 36 p. 5, and his response to the out-of-cycle evaluation, in which he reiterated his charges of slavery and corporate terrorism and indulged in repeated *ad hominem* attacks against his line manager and other members of CTC management. Ex. 52. An employer should not be required to tolerate such offensive behavior, and the Court will not misconstrue the protections of Title VII to hold otherwise. Many of Plaintiff's weekly reports also contain unreasonable material and are similarly unprotected.[43]

For the reasons stated above, the Court has limited its consideration of protected actions to Plaintiff's first EEOC complaint, his first lawsuit, and his internal complaints of discrimination when

---

[43] Plaintiff also made a formal complaint against Winterscheidt for "abusing the CTC memorandum process" by sending him "a signed copy of a memorandum more than one month after it [was] dated." Ex. 62. The Court finds that no reasonable person could have concluded that Winterscheidt's action was prohibited by Title VII; this complaint was therefore not a protected under Title VII.

75

made through proper channels.[44] The Court will now examine each of the alleged instances of retaliation in turn.

## a. Plaintiff's 1995 annual evaluation and related items

A substantial portion of the record is devoted to Plaintiff's claims that, after the meeting with J. B. Pursley, Jr. in of May 1995 in which they discussed whether Defendant should seek a patent on intellectual property developed at least in part by Plaintiff, he had been "unfairly targeted and victimized by a group of *CTC* employees . . . with a sole aim to teach [him] a lesson for 'breaking the chain of command.'" *See, e.g.*, Ex. 21 p.1; Ex. 24 pp. 2-4; Ex. 39 p. 4. This alleged retaliation included Plaintiff's negative 1995 annual evaluation, denial of permission to attend a professional conference, and issuance of an insubordination memorandum, all by Mary Jane Kleinosky, Plaintiff's line manager at the time.

Title VII's anti-retaliation provision exists solely to "prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms." *Burlington N.*, 548 U.S. 53, 126 S.Ct. at 2415, 165 L.Ed.2d at 360 (citing *Robinson*, 519 U.S. at 346, 117 S.Ct. 843). Plaintiff has made no claim that his discussion with Pursley involved anything but the desirability of seeking a patent. Since the discussion did not involve a complaint of impermissible discrimination it was not a protected activity under Title VII and therefore any retaliation for that discussion, however unfair, does not ground a Title VII claim.

Plaintiff did allege discrimination and violation of Defendant's "equal employment opportunity policy" and the "EEO" Act in his various discussions and submissions beginning with his meeting with

---

[44] As discussed below, the Court has concluded for other reasons that Plaintiff's internal complaints were also not protected actions.

Kathy Jones and Jay Bleehash on January 4, 2001; including his meeting with Jones, Bleehash and George Blasiole on March 20, 2001, and Plaintiff's submission of a memo at that time; his meeting with Jones in June of 2001, in which he requested another investigation of his complaints and where Jones asked Plaintiff to memorialize his complaints; Plaintiff's July 5, 2001 submission of his complaint memorandum; and his meeting with Jones on July 10, 2001. He did not, however, specifically allege discrimination on the basis of race, color, sex, religion, or national origin. In the absence of such allegations, the Third Circuit has held that the underlying complaint is facially invalid and as such not protected by § 2000e-3(a). *Slagle*, 435 F.3d at 266-67.

In both *Slagle* and the cases cited therein, the underlying complaints were merely general complaints of unfairness which did not refer to any statute, *id.* at 263, 266 (citing *Barber v. CSX Dist. Serv.*, 68 F.3d 694, 701-02 (3d Cir. 1995)), or were not cognizable under Title VII. *Id.* at 267 & n.6 (citing *Balazs v. Liebenthal*, 32 F.3d 151, 159-60 (4th Cir. 1994); *Learned v. City of Bellevue*, 860 F.2d 928, 930, 932 (9th Cir. 1988)). As noted above, Plaintiff did refer in his complaint to the EEO Act. In addition, his complaints could have been cognizable under Title VII had he alleged that his various claims of discrimination were based on his race, national origin, or any other protected characteristic. Notwithstanding these distinctions, the Court finds that the core requirement, that the complainant actually allege that the claimed discriminatory act is the result of a protected characteristic of the complainant, was not satisfied in this case. Plaintiff therefore did not state any claim under 42 U.S.C. § 2000e-2(a) in his internal complaints of 2001 and was therefore not protected by § 2000e-3(a).

Even if the underlying complaint is facially valid, an action is not a protected activity under Title VII unless the employee has a "good faith" belief that the objected-to practice is discriminatory. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996) (citing 42 U.S.C. § 2000e-

77

3(a); *Griffiths v. CIGNA Corp.*, 988 F.2d 457, 468 (3d Cir. 1993)). Such good faith is not obvious in the instant case since, although Plaintiff in his January and July, 2001 meetings and submissions appeared to be referring to a pattern of perceived abuse stretching back to 1995 he never, insofar as the Court can determine from the record, claimed discrimination due to race or national origin until his complaint to the EEOC dated October 10, 2001. Plaintiff avers that he had avoided any earlier mention of race because he "was trying to be nice," Depo. p. 74. The content and tone of his various statements and memos going back to his response to the 1995 evaluation belie that assertion.

Even assuming that Plaintiff could show good faith and a facially valid underlying complaint, to invoke the protection of Title VII's anti-retaliation provision he must also show that "a reasonable person in [Plaintiff's] circumstances would have concluded that [Defendant] was engaging in discriminatory conduct." *LeBoon*, 503 F.3d at 232 n.9 (citing *Moore*, 461 F.3d at 344). From the focus of Plaintiff's complaints on Defendant's alleged retaliations for "breaking the chain of command" in 1995, and after the analysis of the prima facie cases of the various instances of alleged discrimination, *supra*, a reasonable factfinder could find that with the exception of the denial of opportunity claims no reasonable person could have concluded that Defendant, by its actions toward Plaintiff, had engaged in invidious discrimination.

Nonetheless, in deciding a motion for summary judgment the Court is obliged to "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Farrell*, 206 F.3d at 278 (citation omitted). Although it has doubts about both the good faith and reasonableness of Plaintiff's complaints, these doubts are not so severe that the Court can find against him on this threshold matter. The Court therefore finds, for the purpose of summary judgment, that Plaintiff's complaint to the EEOC dated October 10, 2001 and the filing of his first lawsuit at 3:02-cv-

162 on June 17, 2002 were protected activities.[45]

### b. Insubordination memo

Plaintiff claims that the Notification of Insubordinate Behavior dated September 18, 2001, issued for Plaintiff's refusal to assign patent rights, was the start of "another innings of [Defendant's] covert retaliation for providing a written discrimination Complaint." Document No. 67 ¶ 67. Plaintiff had been warned on September 17, 2001 that his failure to make the assignment would be viewed by CTC as an act of insubordination. Since the Court has determined that the first protected activity in which Plaintiff engaged took place in October of 2001, Plaintiff cannot make out a claim of retaliation for the issuance of the memo.

Even if the Court were to assume that Plaintiff's earlier internal complaints were protected activity, there is no evidence that David Roberts, the person who issued the memos, knew of Plaintiff's complaints at the time of the warning. There is also no direct evidence that Roberts knew of the complaints on September 18, but in light of Plaintiff's September 17 e-mail to Kathy Jones requesting her to add the threatened notice to Plaintiff's "prior complaint" it is reasonable to assume, for purposes of summary judgment, that he did.

If the Court assumes that Roberts knew of Plaintiff's acts when he issued the notice, it then must determine whether the notice effected a deleterious material change in the terms or conditions of Plaintiff's employment. Demotion, change of work schedule, reassignment, and denial of pay raise and

---

[45] The record is silent regarding the date on which Defendant learned of the EEOC complaint, although Defendant evidently submitted a response to the complaint dated November 20, 2001. *See* Ex. 39 p. 1. The record indicates that Defendant actually learned of the first lawsuit on or about October 10, 2002. Document No. 3 at 3:02-cv-162. Plaintiff also sent a letter to the Department of Labor on July 5, 2001. It is not in the record, and there is no evidence that anyone at CTC knew of it. Nonetheless, to the extent that it claimed discrimination due to Plaintiff's race, color, religion, sex, or national origin pursuant to Title VII, sending it was a protected activity even though it went to the wrong agency. *Slagle*, 435 F.2d at 267 (citing *Hicks* 572 F.2d at 969).

promotion are all material changes. *See Weston*, 251 F.3d at 431. Plaintiff, after receiving raises of 5.6 percent in 2000 and 6 percent in 2001 received no raise for 2002. Ex. 35. As discussed above, Defendant has indicated that annual raises, at least for its exempt employees, were based on their performance evaluations. Plaintiff's 2001 evaluation mentioned the notice, Document No. 36 p. 3, and the recommendation that Plaintiff receive no raise for 2002 was made by Gregory Holt, the same person who prepared the evaluation. Document No. 35; Document No. 36 pp. 3-4. The Court concludes that the notice of insubordination was an adverse employment action.

If the internal complaints had been protected acts, Plaintiff would next have to show causation. Roberts issued the notice of insubordination approximately two months after Plaintiff's July submission and meeting.[46] So far as the Court is aware, the Third Circuit has held on only one occasion that temporal proximity, without more, was sufficient to establish causation, and that in a case where the time between the protected act and the complained of action was two days. *See Weston*, 251 F.3d. at 431 & n.5 (citing *Jalil*. 873 F.2d at 708). At this point, in the absence of any other evidence of causation, Plaintiff's burden to show causation intersects with the analysis of whether Defendant's stated reason for the memo, Plaintiff's refusal to comply with Defendant's intellectual property policies as set forth in Defendant's IP manual and as explained to Plaintiff by Roberts, was pretext. *See id.* at 432. As discussed above in the discrimination analysis, Plaintiff cannot show pretext; he was clearly insubordinate[47] and presented no evidence that Defendant had ever waived its IP policies for persons who were not members of Plaintiff's protected class. This claim must therefore fail.

---

[46] Even if Roberts only learned of Plaintiff's complaints after Plaintiff's e-mail to Jones he had, prior to the e-mail, advised Plaintiff that the notice would be forthcoming unless Plaintiff signed the assignment; under the circumstances issuance of the notice was inevitable at that point.

[47] "Insubordinate" is defined as "Not submissive to authority: DISOBEDIENT." Webster's 575.

### c. Plaintiff's 2001 evaluation and position description

Plaintiff filed his first complaint with the EEOC on October 10, 2001; Gregory Holt, Plaintiff's line manager, completed Plaintiff's annual performance evaluation on October 25, 2001. Ex. 2; Ex. 36 p. 4. Plaintiff has offered no evidence that anyone at CTC, let alone Holt, knew of the EEOC filing on October 25. However, the EEOC is required to "serve respondent a copy of the charge, by mail or in person" within ten days of its filing. 29 C.F.R. § 1601.14(a). The Court will therefore assume, for purposes of summary judgment, that Holt knew of the complaint.[48]

As noted above, as a result of the 2001 evaluation Plaintiff received no raise; this was clearly an adverse employment action. Causation is more problematic. Since even in *Jalil* the Third Circuit held that temporal proximity was sufficient to establish causation only on "the unusually suggestive facts of that case," *Weston*, 251 F.3d. at 431 & n.5 (citing *Jalil*. 873 F.2d at 708), and since the Court is aware of no other case in which the Third Circuit has found temporal proximity alone to be sufficient to establish causation, the Court will not infer it solely on that ground here.

Antagonism that arose between the time of the protected activity and the time of the adverse employment action can be used to show causation. Holt ostensibly prepared both Plaintiff's 2000 and 2001 evaluations. Since the 2000 evaluation, prepared before Plaintiff's protected act, rated Plaintiff a 3 overall and found him to be "intelligent, hard working and generally pleasing to work with," and with the potential to be "one of the best resources CTC [had]," Ex. 17 p.4, while the 2001 evaluation, prepared after Plaintiff's protected act, rated him a 2 and said that he "[m]ust change performance and behavior if continued employment at CTC is expected," it would at first blush appear possible to infer

---

[48] The Court notes that the following analysis would be essentially the same if Plaintiff's internal complaints were assumed to have been protected.

81

intervening antagonism, at least between Holt and Plaintiff. Plaintiff has, however, undermined such an inference with his own testimony, claiming that George Blasiole, not Holt, was in fact the person who prepared the 2000 review and suggesting that Holt's initial review was far more negative. Depo. pp. 53-55; *see also* Document No. 17 p. 4 (showing that Blasiole signed the evaluation the day before Holt); *but see* Document No. 65-3 p. 24 (showing the summary page of the "retracted version" of the review, allegedly prepared by Holt, which was nearly identical to the summary page purportedly prepared by Blasiole).

Plaintiff fares somewhat better if the 2001 evaluation is viewed as indicating newly-minted antagonism from CTC as a whole.[49] However, negative evaluations were not new to Plaintiff; he had also received them in 1995 and 1996.[50] Moreover, even the positive evaluations in the record allude to problems with attitude, Ex. 10 p. 3, completion of tasks, *id.*, communication with project leads and co-workers, Ex. 17 p.3, and getting along with supervisors when there were disagreements, *id.*, all problems identified, albeit in much harsher tones, in the 2001 review. When, starting in 1995, Plaintiff had problems at CTC, they consistently came down to attitude and behavior, and in that respect the 2001 review was no exception. In light of Plaintiff's history, the Court cannot infer the sort of qualitative change in Plaintiff's relationship with Defendant necessary to show intervening antagonism.

The one major discrepancy between the 2001 review and every other evaluation in the record was its assertion that plaintiff had performed several assignments very poorly. Ex. 36 p. 5. Plaintiff had generally been characterized as competent in his work. This anomaly is sufficient, for the purposes

---

[49] Blasiole, for example, did not sign the 2001 evaluation until after both Holt and Plaintiff; if he did in fact intervene in 2000 he apparently did not do so the following year. *See* Ex. 36 p. 4.

[50] He also claims to have received a negative evaluation from Kathy Carr in 1999, in which "she did not show any inclination to be fair, honest, impartial and objective in her review." Document No. 67 ¶ 32. Defendant, however, claims that the "next" review Plaintiff received after being rehired in 1999 was in 2000. Document No. 55 ¶ 32.

of summary judgment, to allow the Court to infer causation.

Since Plaintiff has made out his prima facie case for purposes of summary judgment, the Court now turns to Defendant's absolutely consistent rebuttal: that Defendant's behavior and lack of interpersonal skills led to the poor evaluation. To that Defendant adds the notice of insubordination for failure to comply with CTC's IP policies, and the fact that Plaintiff posted the notice in his cubicle, "further fostering a non-team attitude among other CTC personnel." Ex. 36 p. 3.

Plaintiff attempts to show that Defendant's reasons are pretextual in several ways. He first argues that the poor evaluation was a reprisal as threatened by Kathy Jones's memorandum of September 21, 2001. Document No. 78 p. 2. It admonished Plaintiff as follows:

> After great time and expense, my response and this memorandum bring this matter to a close. *CTC* considers that the issues you have raised have been thoroughly investigated and resolved. The company expects that these matters will no longer be discussed and we will be moving forward. If you persist in raising these issues, such action will adversely afferct [sic] your performance appraisals and may lead to disciplinary action.

Ex. 32 p. 6. Viewed in the context of Plaintiff's obsessive concerns with incidents that had happened as far back as 1995, and given the specious nature of his complaints, no rational factfinder could conclude that this memorandum was anything but an attempt by an employer to maintain order and minimize disruption in the workplace by achieving finality. *See Robbins*, 186 F.3d at 1259-60; *Rollins*, 868 F.2d at 401. Individuals are not allowed to endlessly petition the same court to revisit an already-decided case and may be sanctioned if they do. An employer should be granted the same consideration. As with the courts, there was nothing to prevent Plaintiff from appealing and, indeed, he in effect did so when he filed his first complaint with the EEOC.

As for Plaintiff's claim that "[p]ersisting with an EEO complaint while demanding parity with Caucasians on promotion, wages, bonuses, and career growth opportunities . . . . is a protected activity,"

83

Document No. 78 p. 2, the Court has already established that the first protected activity in which Plaintiff engaged was his complaint to the EEOC, which was made several weeks *after* the September 2001 memo. Plaintiff could not persist in what he had not yet begun.

Plaintiff next argues that the 2001 evaluation was factually incorrect in concluding that his performance had been deficient. Although he refers to various documents in support of this assertion he has failed to offer them as evidence. *See* Document No. 64 pp. 14-17.[51] Moreover, a showing of mistake or even incompetence on the part of the "relevant decisionmaker," in this case Holt, will not meet Plaintiff's burden. *Fuentes*, 32 F.3d at 765-66. Holt apparently relied on evaluations prepared by other people when he wrote that some of Plaintiff's work had been "rated as very poor." Ex. 36 p. 5. If Holt believed the negative evaluations submitted by others who had worked with Plaintiff, and if those evaluators had not acted from impermissible motives, then there can be no showing of pretext even if the evaluations were in error. *See Fuentes*, 32 F.3d at 766-67. Indeed, for Plaintiff to prevail on this point he would either have to show that the negative evaluations submitted to Holt were (1) motivated by impermissible bias or retaliatory intent, in the latter case requiring a showing that the evaluators were aware of Plaintiff's protected activities, or (2) that the evaluations were actually positive and Holt chose to ignore them. *See id.* He has done neither.

Plaintiff also addresses the issue of his behavior directly. He argues that if his personality traits were "truly unacceptable, the Court could rightly expect that Defendant should have disciplined Plaintiff, at least on a few occasions" and that Defendant never disciplined Plaintiff. Document No. 64, pp. 6, 24 (citing Document No. 65-3 p. 33). He is mistaken. In the first place, the evidence he cites

---

[51] For the most part he has failed to offer them at all. He does refer to one document which he claims shows that in fact his welding work was superior, but it is merely an e-mail from Plaintiff which contains nothing but unsupported, unexplained and unsworn assertions by Plaintiff himself, Ex. 41, and will therefore not be considered by the Court.

for the absence of discipline is Defendant's response to the following interrogatory: "Has CTC ever disciplined Sampath because he was found to intentionally or unintentionally lie, cheat, misrepresent, falsify test data or records?" Document No. 65-3 p. 33. Defendant responded, "Objection. [The interrogatory] is ambiguous as Defendant is uncertain how Plaintiff would define an 'unintentional lie.' Notwithstanding the foregoing objection, no." The question and response say nothing about discipline for Plaintiff's behavior and are therefore irrelevant to the present inquiry.

In addition, in light of the substantial impact a notice of insubordination could have on the career and compensation of a CTC employee, such a notice qualified as discipline. Plaintiff's propensity for insubordination was clearly unacceptable to Defendant, which issued Plaintiff "several 'insubordination memos'" starting in 1995 when Plaintiff, objecting to his line manager's "behavior and discriminatory practices," protested in his "Gandhian way" by refusing to attend department meetings "until she changed her attitude and behavior." Document No. 39 p. 9. Plaintiff also cites a memo in which he was advised, after being instructed at least twice not to initiate unauthorized contacts with outside personnel and having done so anyway, that further "[f]ailure to comply with [that] instruction [would] be considered insubordination." Document No. 39 p. 9 (citing Ex. 24 p. 32). The Court has already discussed the notice of insubordination due to Plaintiff's refusal to abide by Defendant's IP policy.

Insubordination memoranda were not Defendant's only means of communicating its concerns about his behavior to Plaintiff. He was also warned, when he returned to CTC after obtaining his MBA, that he would face "immediate disciplinary action" if the issues identified in Plaintiff's earlier performance appraisals, which only involved his behavior, recurred. Document No. 65-3 p. 19. Plaintiff's annual performance appraisals themselves were replete with references to his behavior. The

85

1995 appraisal, which lauded Plaintiff's technical abilities, was very critical of his deportment and suggested that corrective action was a necessary condition of Plaintiff's continued employment. The 1996 appraisal, by a different line manager, was also critical. It too identified "interpersonal skills" as Plaintiff's only weak point. Even the 1997 evaluation, which was one of Plaintiff's most positive, admonished him to "get over" his previous bad experiences and "continue to keep a positive attitude." Ex. 10 p. 3.

Plaintiff was at Cornell for most of 1998 and there is no evaluation in the record. There is also no evaluation for 1999 in the record, although Plaintiff claims that he did receive a negative review that year. The evaluation from 2000 is the most positive in the record, yet even there hints of Plaintiff's ongoing behavioral problems were present in its statement that Plaintiff "need[ed] to improve communication with his project leads and co-workers to periodically verify project directions, and avoid possible misunderstandings," and its acknowledgment that Plaintiff's commitment to his own point of view in the face of contrary opinions from his superiors had "occasionally . . . caused misunderstandings . . . ." Document No. 17 p. 3.

At various times Plaintiff has also argued that "if [his] interpersonal skills were the real issue, *CTC* would have provided [him] with appropriate training and counseling opportunities that would have enabled [him] to overcome this alleged behavior." Ex. 39 p. 3; Depo. pp. 98-99. The Court notes that Defendant did attempt to refer Plaintiff to its Employee Assistance Program; it was Plaintiff who refused to participate. More generally, the Court is aware of no duty on the part of an employer to properly socialize its employees.

Plaintiff also claims that Defendant made several "unwelcome, arbitrary, and illegitimate changes to schedule and work assignments" as a result of the 2001 performance review. Document No.

86

64 p. 8. He does not bother to elaborate. In comparing Plaintiff's position descriptions attached to the 2000 and 2001 reviews, the Court cannot see anything that indicates a change in schedule, and the work assignments and goals, while somewhat different, appear with one excpetion to be *de minimis*. The 2001 description required that Plaintiff "[m]aintain a Direct labor level of 85% or greater," Ex. 36 p.9,while that requirement is not included in the 2000 document. *See* Ex. 10 pp. 6-8.

Plaintiff cannot, however, demonstrate that this was an adverse employment action. Defendant indicates that it had become "very difficult" to obtain "appropriate tasking" for Plaintiff,. Ex. 36 p. 4. Plaintiff does not deny that he was having problems maintaining full tasking even though he had previously maintained "almost 100% billable hours" since 1993. Depo. pp. 99-100; Document No. 64 pp. 11-12. He has also admitted that the alternative, going on overhead, was considered to be a negative at CTC. Depo. p. 139. The Court cannot, therefore, see how Defendant's spelling out an obvious requirement of Plaintiff's employment would have been likely to deter Plaintiff "from complaining to the EEOC" and hence materially adverse. *Burlington N.*, 548 U.S. 53, 126 S.Ct. at 2415, 165 L.Ed.2d at 360.

Similarly, Plaintiff has presented no evidence that would allow a reasonable factfinder to conclude that any reason other than Plaintiff's decrease in billable hours furnished the impetus for the 85 percent requirement. Plaintiff's only argument is that his hours fell because of discriminatory or retaliatory animus on the part of, presumably every possible person for whom he could have worked at CTC. As seen above, however, he has made no such showing.

87

### d. Plaintiff's out-of-cycle review

In response to a request by Plaintiff,[52] his next line manager, Daniel Winterscheidt, completed an out-of-cycle evaluation on April 26, 2002, and reviewed it with Plaintiff on May 17, 2002. Document No. 50 p. 4. It rated Plaintiff a 2, based solely on his behavior. It found him to have an "adversarial approach" and said that he was viewed as "confrontational and disruptive"; that he "tend[ed] to dwell on past transgresssions"; that he seemed "arrogant" at times and was "somewhat stubborn"; and that he "exhibit[ed] a significantly distorted perception of his leadership ability." Ex. 49 p. 3. It also declared Plaintiff's position that he would not undertake further cost analysis work unless he received additional compensation to be "absolutely unacceptable" and said Plaintiff's position had to be "corrected immediately." *Id.* at 5. Plaintiff was advised to "[d]evelop a "team work' philosophy [and] work hard not to alienate coworkers," as well as to "[k]eep email correspondence short and non-confrontational." *Id.* at 4. Notwithstanding the many criticisms, however, Winterscheidt wrote that Plaintiff had made progress and "[w]ith continued improvement [Plaintiff's] performance could be evaluated as level 3 at his next (11/01/02) performance review." *Id.*

This review obviously occurred after the protected acts discussed in the previous section. In addition, Defendant knew of Plaintiff's complaint to the EEOC no later than November 20, 2001, Ex. 39 p. 1, and the Court will assume that it had informed Winterscheidt. There is, however, no evidence that Defendant was aware of Plaintiff's letter to the EEOC investigator dated January 4, 2002 and the Court will not presume otherwise. The Court notes that due to its offensive content, as discussed above, Plaintiff's "corporate terrorism" response to his 2001 evaluation was not protected, although

---

[52] Plaintiff states that he had requested "only a re-appraisal," since he believed the 2001 review to be "clearly erroneous," and not a new review. Document No. 64 p. 20. Essentially, he wanted the 2001 and previous evaluations back to 1995 to be redone to conform to his own view of his performance rather than the fresh appraisal of his current performance that he actually received. Ex. 52 p. 1.

88

Winterscheidt was likely aware of it.[53]

Although Plaintiff can show that the out-of-cycle review took place after protected acts of which Winterscheidt was aware, it is less clear that it can be characterized as an adverse employment action. It did not result in a raise, but Winterscheidt had advised Plaintiff that "there would be no salary action at [that time]." Ex. 61 p. 1; Winterscheidt Aff. In light of the actual purpose of the review, it is more appropriately viewed as a positive employment action. The 2001 review had intimated that Plaintiff's employment was in jeopardy; the out-of-cycle review no longer contained that suggestion but instead stated that Plaintiff could, with continued improvement, be rated at level 3, a level at which he had previously received raises after his 1997 and 2000 evaluations.[54]

Even assuming that Plaintiff could manage to show that an improved review was nonetheless an adverse employment action, he would still struggle to show causation. He cannot do it by temporal proximity; Defendant knew of the EEOC complaint approximately six months before the out-of-cycle review. He cannot do it by pointing out inconsistencies; to the extent the 2001 and out-of-cycle reviews were inconsistent, the out-of-cycle review was more favorable, and portended a solid review in

---

[53] The Court also assumes that pursuant to 29 C.F.R. § 1601.18(b) Defendant and hence Winterscheidt knew by the end of March, 2001 that the EEOC had dismissed Plaintiff's complaint; that pursuant to 29 C.F.R. § 1601.28(b)(3) Plaintiff would therefore have been issued a right to sue letter; and that pursuant to 29 C.F.R. § 1601.19(a) Plaintiff would have 90 days from the date he received the notice in which to file suit in federal district court. Since this action was by the EEOC, however, and the anti-retaliation provision of Title VII protects employee activity, the issuance of a right to sue letter was not a protected activity. *See Whitfield v. Pathmark Stores, Inc.*, No. Civ. A. 96-246 MMS, 1998 WL 372313, at \*9 n.11, 1998 U.S. Dist. LEXIS 9750, at \*30 n.11 (D.Del. June 22, 1998).

The Court, however, parts company with *Whitfield*'s holding that the "proximity between the right to sue letter and the [adverse employment action] . . . may be used to help establish retaliatory motive." *See id.* (citing *Hassan v. Abingdon Sch. Dist.*, Civ. A. No. 89-0078, 1991 WL 96716, at \*9, 1991 U.S. Dist. LEXIS 7431 (E.D. Pa. May 31, 1991)). The Third Circuit's temporal proximity jurisprudence recognizes EEOC notice only insofar as it advises an employer that an employee has engaged in protected activity. *See LeBoon*, 503 F.3d at 232 (citing *Jalil*, 873 F.2d at 708). In the instant case, Defendant had notice via EEOC correspondence of Plaintiff's complaint to that agency no later than November 20, 2001 and the subsequent issuance of a right to sue letter provided Defendant with no further notice of any protected activity by Plaintiff. The Court will therefore not consider the issuance of the right to sue letter in its temporal proximity analysis.

[54] The Court reiterates that it does not know whether Plaintiff was evaluated in 1999, although he also received a raise at the beginning of 2000.

November of 2002. Similarly, the Court will not infer animus from even a marginally *improved* relationship. The Court cannot find that Plaintiff has made out the elements of the prima facie case for this claim.

Even were the Court to assume that Plaintiff had made out his prima facie case, he could not show that Defendant's proffered reason for the evaluation was pretextual. As noted above, the criticisms of Plaintiff's interpersonal skills are absolutely consistent with every other review in the record. These flaws were present throughout Plaintiff's career at CTC; only the magnitude of their impediment to his success changed from year to year.

Plaintiff also claims the alleged "unwelcome, arbitrary, and illegitimate changes to schedule and work assignments" contained in the revised position description attached to the out-of-cycle review were retaliatory in nature. As in the discussion of the 2001 evaluation, *supra*, the Court can discern no changes to Plaintiff's schedule of any sort. There was once again a requirement that Plaintiff maintain at least an 85 percent direct labor level. Ex. 49 p. 8. The Court has already addressed the billable hours requirement, and will only add that as time passed it became ever more difficult for Plaintiff to maintain the necessary level.

The position description added the requirement that Plaintiff "[a]ct as a project consultant for manufacturing cost analysis." *Id.* He vehemently objected at the time, refusing to sign the concurrence line on the position description; stating that Defendant was required by law to provide him "additional compensation"and a promotion before requesting that he use his MBA skills; and further stating that to simply add a cost analysis element to his present duties without a raise was "a surreptitious attempt to introduce and perpetuate slavery in the American workplace." Ex. 52 p. 3; *see also* Ex. 39 p. 12. Once again, Plaintiff cannot make out the second element of the prima facie case of retaliation, as he

90

cannot show how the requirement that someone use newly-acquired skills in his present job, even without added compensation, could deter a reasonable victim of discrimination from filing a Title VII complaint against his employer. The thought process appears to approximate the following: "I recently got an MBA from Cornell. I think I'm being discriminated against and my billable hours are falling because of my race. I'd like to file a complaint with the EEOC, but I'm afraid that if I do the company will make me use my MBA skills in my present job. They won't even pay me more money. I guess I'd better not file that complaint." The Court is not persuaded.

The Court also notes that Plaintiff had performed cost analyses in at least 2000 and 2001, and his 2000 position description included the performance goal of "[c]apitaliz[ing] on knowledge gained from MBA studies," Ex. 17 pp. 2, 7; Ex. 36 p.2. So far as the Court can determine, Plaintiff performed the analyses and signed the position description without complaint.[55] That he at some point misread the "EEO Act" to have required Defendant to "provide its employees the maximum opportunity to achieve challenging and fulfilling assignments and professional growth . . . and appropriately compensate the employee in return for the services rendered," Document No. 39 p. 12, does not transmute Defendant's insistence that he continue to do something that he was already doing into either discrimination or retaliation.

Even assuming that Plaintiff could make out a prima facie case of retaliation, he has offered no evidence to overcome Defendant's proffered non-discriminatory reason for the requirement. Although an employee at Plaintiff's level within CTC was assigned a line manager, most if not all of his intra-

---

[55] By November 28, 2000, Plaintiff was, however, complaining that Defendant had not recognized his MBA with a raise and promotion. Ex. 18; Bleehash Aff.

company work assignments came from individual program managers.[56] As the Court understands Defendant's tasking scheme, it was a quasi-entrepreneurial affair rather like a law firm, where employees at Plaintiff's level were "expected to 'market' [their] skills to [program managers] or develop business within [their] professional area of expertise to sustain direct labor hours."[57] Ex. 84 p. 2. Defendant states that Plaintiff's behavior had alienated the relevant program managers to the point that it had become difficult for him to maintain appropriate tasking levels[58] doing purely technical work, and that performing cost analysis was another way in which he could boost his billable hours. In addition, Defendant pointed out that "cost analysis is part of manufacturing/engineering work." Ex. 49 p. 5.

Plaintiff does not dispute that his tasking had fallen off as early as November of 2001. Depo. pp. 99-100. He has never claimed that having to perform cost analysis in addition to his other duties would have imposed any punitive burden, as it might have if he had already had more work than he could handle. He does claim that there was ample technical work at CTC for someone of his level, but offers no proof. Even if true, that does nothing to refute Defendant's assertion that no matter how much technical work there was the program managers, due to Plaintiff's behavior, were ever less willing to give it to him. To the extent that Plaintiff alleges that the program managers were retaliating

---

[56] Employees at Plaintiff's level were also expected to develop business by contacts with persons outside the company but, as discussed during the discrimination analysis, Plaintiff's behavioral issues had made Defendant reluctant to permit such contact.

[57] Plaintiff's position, however, was that it was his line manager's job to find him work. Depo pp. 98-99, 121, 131. He has, however, offered no evidence in support of that position.

[58] To illustrate the point it offered an e-mail exchange from November 19, 2001, in which Plaintiff responded to a program manager's request that he draft a stat ement of work by e-mailing his line manager that in the past the program manager had "been very subjective and arbitrary in his opinions regarding [Plaintiff's] work contributions"; that Plaintiff did "not expect [the program manager's] assessment of whatever [Plaintiff did] to be fair"; and that Plaintiff felt "this [was] a no win situation." Ex. 37 p. 1.

against him, he has provided no evidence that any program manager knew of Plaintiff's complaints either to Kathy Jones or the EEOC . Moreover, as discussed above, disruptive and obnoxious behavior in the workplace, even if ostensibly in opposition to discriminatory behavior, is not protected by Title VII's anti-retaliation provision.

### e. Individual evaluations prepared as part of Plaintiff's 2002 annual performance review

Before preparing Plaintiff's 2002 annual evaluation, Winterscheidt solicited feedback regarding Plaintiff's performance from eight individuals within CTC who were familiar with Plaintiff's recent work. These included co-workers, at least two program managers, and Joe Pickens, whose job title was Chief Scientist. Depo. pp. 145-54. While two of the reports were completely positive, six identified the same negatives regarding Plaintiff's behavior and attitude that had permeated his previous performance reviews. *See* Ex. 65. When confronted with these evaluations Plaintiff said that they were "part of retaliation." Depo. p. 152. Regardless of Plaintiff's opinion, however, they are not cognizable as retaliation under Title VII since Plaintiff has admitted that he had "no idea" whether the evaluators knew that he had filed an EEOC complaint. Absent a showing of knowledge of the protected act, a complaint for retaliation cannot lie. *Andreoli*, 482 F.3d at 650; *Weston*, 251 F.3d at 433 (citing *Jones*, 198 F.3d at 415).

### f. Plaintiff's 2002 annual performance review

Plaintiff sent Defendant a waiver of service of summons on October 10, 2002; it was returned on October 17, 2002. Document No. 3 at 3:02-cv-162. This was roughly the period in which Winterscheidt solicited and received the evaluations discussed above, but since Plaintiff has admitted that he has no evidence of the evaluators' knowledge of his protected activities the timing is irrelevant for that inquiry. The Court has, however, assumed for purposes of summary judgment that

93

Winterscheidt as Plaintiff's line manager was aware of Plaintiff's protected activities, and will therefore assume that he was aware of Plaintiff's first lawsuit by October 31, 2002, the date he signed Plaintiff's 2002 annual evaluation.

The filing of the lawsuit was a protected act. The 2002 evaluation was sufficiently negative to suggest that Plaintiff would be receiving no raise in 2003 as, indeed, he did not; the evaluation was an adverse employment action. Plaintiff cannot, however, show causation. The Third Circuit is extremely reluctant to infer causation from temporal proximity alone, and the Court will follow suit; as should be apparent from the foregoing analysis, there is nothing about the facts of this case that is "unusually suggestive" of discrimination. *See Weston*, 251 F.3d at 431 n.5 (citing *Jalil*, 873 F.2d at 708) (limiting the holding in *Jalil*, the only case in which the Third Circuit has found temporal proximity alone to be sufficient, "to the unusually suggestive facts of that case . . . "). Plaintiff cannot show intervening antagonism. While the 2002 annual review was more negative than the out-of-cycle review, that difference was merely quantitative; there was no qualitative change. *See LeBoon*, 503 F.3d at 233 (requiring a showing of a "qualitatively different" relationship between supervisor and employee after the protected act). Plaintiff also cannot show inconsistencies. Viewed broadly, the review was merely a logical continuation of a pattern that had begun in 1995. Viewed narrowly, as discussed above, it was not dramatically different from the 2001 or out-of-cycle appraisals that had preceded it.

Plaintiff could not prevail even if he could establish causation. As an initial matter, it is clear from the record that Winterscheidt relied on other people's evaluations, at least in part, in preparing the review. So long as the preliminary evaluations were not themselves the result of discriminatory or retaliatory animus, Plaintiff would have to prove that Winterscheidt "in fact did not rely upon them" to prove pretext. *Fuentes*, 32 F.3d at 766-67. Plaintiff has admitted that he cannot show retaliatory

animus on the part of the preliminary evaluators, and has offered no evidence to show that their evaluations were motivated even in part by bias against his race or national origin.

Plaintiff has also offered no evidence to refute the assertions contained in Winterscheidt's review, most notably that he "tend[ed] to have conflicts with management and some senior technical personnel"; "continued to exhibit a distorted view of the significance of his accomplishments"; was unwilling to accept constructive criticism, as indicated by Plaintiff's memo in response to the out-of-cycle evaluation; "continue[d] to dwell on past perceived transgressions"; had continued to refuse assignments; and that his "refusal to use his MBA skills combined with his argumentative nature [had] made it difficult to convince [program managers] to assign tasking to him," resulting in a tasking level of only 30 percent.[59] Ex. 68 pp. 3, 5. To the contrary, Plaintiff has admitted to the conflicts, *see* Depo. p. 152; *see also* Ex. 52; that he was refusing assignments involving use of his MBA skills, *see* Depo. pp. 129, 131, 137; Ex. 53 p. 3; Ex. 57 p. 2; and that he did not have full-time tasking. *See* Ex. 62. A rational factfinder could not conclude that Plaintiff's memo in response to his out-of-cycle review, Ex. 52, did not show an inability to take criticism, and during this period Plaintiff did revisit his 2001 performance appraisal, a past perceived transgression, in a weekly report. Ex. 62 p. 18.

The retaliation analysis for the position description attached to the 2002 annual review is nearly identical to that conducted above, as the two documents are themselves nearly identical. The newer description actually had lower requirements in the business development category, requiring that Plaintiff "[w]in at least $50,000 in new business," down from $80,000; that he "[a]ct as proposal

---

[59] The Court notes that when Plaintiff confronted Winterscheidt with a factual inaccuracy in the original report regarding the reason Plaintiff had been asked to stop charging on a particular task Winterscheidt promptly changed the report to conform to Plaintiff's version of events; the evaluation in the record reflects the change. Depo. pp. 159-60; Ex. 68 p. 5; Ex. 69. Tellingly, Winterscheidt had to notify Plaintiff of the change by e-mail, as Plaintiff refused to meet with him. Ex. 69.

manager for at least one proposal," rather than three; and that he "[p]articipate as a member of the proposal team on at least two proposals," again rather than three. *Compare* Ex. 49 p. 7 *with* Ex. 68 p. 7. The Court finds that easing the requirements of a job description is not an adverse action.

The new position description did, however, require for the first time that Plaintiff "[a]chieve (within 90 days) and maintain a Direct Labor level of 85% or greater." Ex. 68 p. 8. Although an added demand, it is not clear to the Court that this could be termed adverse. The Court is not persuaded that an employee who knew that he was obliged to maintain a high percentage of direct tasking, who had started charging his time to overhead, and who knew that charging to overhead was a practice disfavored by his employer would be deterred from filing a complaint of discrimination by a formal requirement that he reestablish an appropriate direct labor level. The Court might view things differently if Defendant had carried Plaintiff on overhead for an extended period of time and then suddenly given him 90 days to dramatically increase his billable hours, but that is not what happened in the instant case. The record is clear that Defendant warned Plaintiff as soon as his tasking started to slip. Moreover, even if Plaintiff could make out his prima facie case, he has offered no evidence to demonstrate that Defendant's stated reason for the new demand, *i.e.*, that Plaintiff's tasking had dropped off; Defendant required a higher level of direct tasking than Plaintiff was then generating; and Plaintiff therefore had to increase his level of direct tasking, was pretextual.

### g. The meeting and memorandum placing Plaintiff on probation

The meeting with Winterscheidt and Kathy Jones at which Plaintiff was placed on probation took place on February 20, 2003. As the probation memo made it clear that failure to comply with the terms of Plaintiff's probation could lead to "further disciplinary action, up to and including termination," Ex. 84 p. 3, the Court finds that this was an adverse employment action. Plaintiff cannot,

96

however, make out causation. This was obviously at a greater temporal remove from Plaintiff's last protected activity than the 2002 annual review; he cannot show causation through temporal proximity. Although the record indicates a deterioration in the relationship between Plaintiff and Winterscheidt there is no indication that it was qualitatively different; Plaintiff cannot show intervening antagonism. Plaintiff also cannot show inconsistencies. Indeed, when viewed in the context of the entire record, the probation meeting seems inevitable.

Even if Plaintiff could make out a prima facie case, he could not show that Defendant's reasons for placing him on probation were pretextual. As an initial matter, Defendant has stated that the probation procedure afforded Plaintiff was the one employed in all cases such as his and hence non-discriminatory. Ex. 85 p. 2. Plaintiff has offered no evidence to the contrary. At the probation meeting, Plaintiff was given a list of goals in the 2002 annual review that included the following:

- Immediately cease [Plaintiff's] combative style
- Immediately cease dredging up perceived transgressions.
- Immediately cease refusing assignments that involve cost analysis
- Take personal responsibility for success at CTC
- Listen to and follow line manager's advice to improve performance
- Tasking shortfall must be rectified immediately

Ex. 68 pp. 4-5; Ex. 84; Depo. pp. 156-57; Winterscheidt Aff. Plaintiff has never denied that he refused cost analysis assignments. The record makes it clear that Plaintiff failed to meet any of the other goals set forth above as well.[60] In addition, the probation memorandum referred to many instances of the sort

---

[60] The record also makes it clear that Winterscheidt, notwithstanding Plaintiff's behavior toward him, attempted to find work for Plaintiff. He solicited purely technical work from others, albeit with no success. Ex. 81; Winterscheidt Aff. He also offered to assign Plaintiff the "economic analysis" of his own project. Ex. 82. Plaintiff refused since that would involve use of his MBA skills, and he viewed any request that he use those skills without extra compensation to be illegal. *See* Ex. 82 (stating he could "not abet *CTC* not follow the law"); Depo. p. 174. In addition, Winterscheidt indicated that he would allow Plaintiff to develop an overhead project. Ex. 71, 73; Winterscheidt Aff. Plaintiff claimed that he needed a "template of [Winterscheidt's] expectations" before he could prepare the proposal; Winterscheidt, finding such a template unnecessary, did not provide one; and Plaintiff never made a proposal. Ex. 74, 84, 85.

of disruptive, confrontational and offensive behavior that is not protected even when ostensibly motivated by opposition to discrimination. *See* Ex. 84 p. 2. Those claims too are fully supported by the record. *See* Ex. 70-71, 73-75, 78-80, 82-83; Winterscheidt Aff.

### h. Plaintiff's termination

Plaintiff was terminated on February 24, 2003. He cannot show that his termination was caused by his protected acts. His firing was even farther from the time of his protected actions than his 2002 review and the probation meeting. He can show no intervening antagonism; there was no qualitative difference in Plaintiff's relationship with Winterscheidt or indeed CTC in general between the probation meeting and the end of his employment. *See* Ex. 85; Jones Aff. He can also show no inconsistences. Plaintiff's problems at CTC were always related to his behavior and these problems had been present since at least 1995. Indeed, his termination in 2003 can be viewed as the logical conclusion foretold by his 1995 annual review and response thereto. More proximately, Plaintiff was presented with a sixteen-point performance improvement plan as part of the probation memo and cautioned that "[c]ontinued performance without drastic improvement [was] absolutely unacceptable." Ex. 84 pp. 2-4. At the probation meeting he stated that he would not comply with anything in the performance improvement plan and subsequently did not. Ex. 85 p. 6; Depo. p. 183; Jones Aff.

Even if Plaintiff were somehow able to make out a prima facie case, he could not overcome Defendant's stated reasons for his termination. Given the level of consistency in the record, the inevitability of plaintiff's termination in light of his insubordinate refusal to comply with any part of the probation memorandum's requirements, and Plaintiff's failure to offer any evidence in contravention, no rational finder of fact could hold either that Defendant's stated reasons for Plaintiff's termination were pretextual or that his termination was in fact motivated by retaliatory animus.

98

## CONCLUSION

In many if not most of his claims for discrimination and retaliation Plaintiff has failed to make out the appropriate prima facie case. Even where he has, he has not pointed to evidence sufficient to show that Defendant's stated reason for its actions, Plaintiff's behavior, was not in fact the reason for Defendant's actions, up to and including his termination. The Court will therefore enter summary judgment for Defendant on all counts, including those added *sua sponte* by the Court. An appropriate order follows.

## ORDER

**AND NOW**, this 31st day of March, 2008, the Court having considered Defendant's Motion for Summary Judgment and supporting documents, (Document Nos. 53-56); Plaintiff's Consolidated Motion for Summary Judgment and supporting documents, (Document Nos. 63-65); Plaintiff's Reply to Defendant's Motion for Summary Judgment and supporting documents, (Document Nos. 66-68); Defendant's Response to Plaintiff's Motion for Summary Judgment and supporting documents, (Document Nos. 71-73); and Plaintiff's Opposition to Court's Order Regarding Summary Judgment and attached documents, (Document No. 78), for the reasons set forth in the foregoing Memorandum Opinion, it is **HEREBY ORDERED** as follows:

1. Plaintiff's Consolidated Motion for Summary Judgment, (Document No. 63) is **DENIED**;

2. Defendant's Motion for Summary Judgment, (Document No. 53) is **GRANTED**, and the sole count of the complaint at 3:03-cv-264 is **DISMISSED WITH PREJUDICE**;

3. Summary judgment is **ENTERED** against all of Plaintiff's various claims of ongoing

pay discrimination, ongoing retaliatory harassment, ongoing denial of opportunities for professional development, and ongoing failure to promote, as more fully described in the foregoing memorandum opinion, and those claims are **DISMISSED WITH PREJUDICE**. The Clerk shall mark this matter closed.

BY THE COURT:

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**

100